UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TROY HENDRIX,

               Plaintiff,

    vs.

ANTHONY J. ANNUCCI, Acting
Commissioner, Department of Corrections
and Community Supervision; DR. JOHN
MORLEY, DOCCS Deputy Commissioner &
Chief Medical Officer; JAMES
O'GORMAN, Deputy Commissioner for
Correctional Facilities; DR. CARL
KOENIGSMANN, former DOCCS Deputy
Commissioner & Chief Medical Officer;
JOSEPH BELLNIER, former DOCCS
Deputy Commissioner for Correctional
Facilities; PATRICK REARDON,
Superintendent of Marcy Correctional
Facility; JUSTIN THOMAS, former
Superintendent of Marcy Correctional
Facility; JOHN COLVIN, former
Superintendent of Five Points Correctional
Facility; PAUL CHAPPIUS, former
Superintendent of Elmira Correctional
Facility; JOHN or JANE DOES 1-5, members
of the DOCCS SHMC at Elmira Correctional
Facility; JOHN or JANE DOES 6-10,
members of the DOCCS SHMC at Marcy
Correctional Facility; JOHN or JANE DOES
11-15, members of the DOCCS SHMC at
Five Points;

               Defendants.

---

**<u>COMPLAINT</u>**

**JURY TRIAL REQUESTED**

9:20-cv-743 (GTS/TWD)

Plaintiff Troy Hendrix ("Plaintiff" or "Mr. Hendrix"), by his counsel Sidley Austin LLP, as and for this Complaint, alleges the following:

## INTRODUCTION

1.      This is a civil rights action for injunctive and declaratory relief, as well as compensatory and punitive damages, under 42 U.S.C. § 1983 for violations of Mr. Hendrix's rights to due process under the Fourteenth Amendment to the United States Constitution and to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

2.      For over 11 consecutive years, Mr. Hendrix was subjected to long-term, cumulative, and continuous punishment by being placed in solitary confinement in a Special Housing Unit ("SHU") [1] while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS").  Mr. Hendrix has been confined alone in a small cell for at least 23 hours a day.  He is denied meaningful human contact for extended periods; he has, on at least one occasion, gone almost three months without human interaction.  Although he has not done anything while incarcerated to warrant such extreme treatment, Mr. Hendrix has fewer rights and privileges than people do in the general prison population.  He eats alone from a tray provided to him through a slot in his door and has been denied access to therapeutic or mental

---

[1] Mr. Hendrix uses the term "solitary confinement" to refer to his confinement in the SHU under Administrative Segregation ("Ad Seg") status, including his continued solitary confinement in the Residential Mental Health Unit ("RMHU").  The National Commission on Correctional Health Care ("NCCHC") similarly defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."  National Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation) (2019), available at http://www.ncchc.org/solitary-confinement.  This confinement has other names, including isolated confinement, extreme isolation, segregation, room restriction, and SHU, but, in all cases, the prisoner experiences the same harmful isolation and other deprivations.

health groups and programs.  He has effectively been denied regular access to outdoor activity as well as access to religious, vocational, recreational, and educational programs.

3.      In late 2017, Mr. Hendrix was transferred to a Residential Mental Health Unit ("RMHU").  Although "[o]nce admitted to the RMHU, inmate patients are not considered to be in SHU,"[2] the conditions of Mr. Hendrix's confinement are substantially similar to those of solitary confinement in the SHU.  In the RMHU, Mr. Hendrix spends at least 20 hours per day in his cell, leaving only for four hours of programming each weekday.  His current cell has an enclosed outdoor area attached at the back; during the time he spends outdoors, he remains isolated from other people.

4.      It is well established that prolonged solitary confinement causes severe harm and has compounding negative effects, especially on the young, disabled, and mentally ill. Nevertheless, DOCCS subjects numerous New York State prisoners to prolonged solitary confinement.

5.      Through their policies and practices as well as other acts or omissions, Defendants have subjected Mr. Hendrix to solitary confinement for an unreasonable and unconstitutional length of time.  Defendants have failed to provide Mr. Hendrix with constitutionally adequate due process regarding the review of his administrative punishments, instead effectively rubber-stamping them for well over 10 years.

6.      Mr. Hendrix's years of solitary confinement have caused and continues to cause him to suffer lasting physical and emotional trauma.  He developed photophobia (incurable severe sensitivity to light that requires the use of dark tinted glasses) during his solitary confinement due to facilities keeping cell lights on for the majority of the day and night.  His

---

[2] New York State Office of Mental Health and New York State Department of Correctional Services, *Residential Mental Health Unit Program Operations Description* at 3 (Dec. 7, 2009).

asthma has worsened during his detention, he has suffered arthritic pain and stiffness in his knee, and he had a toe infection for which he was refused treatment for so long that he has since needed two surgeries.  Mr. Hendrix's already tenuous mental health has continued to deteriorate in the past decade due to prolonged isolation.  Mr. Hendrix is diagnosed with Antisocial Personality Disorder and Bipolar Disorder.  Yet, Defendants have ignored Mr. Hendrix's diagnoses and have allowed his mental condition to worsen by keeping him in restricted and solitary environments since 2006.

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, by virtue of claims under 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendments.  Moreover, the Court can order declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief.  This Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

8.      Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events constituting Mr. Hendrix's claims have taken place within this district while he has been imprisoned at Marcy Correctional Facility, located in Marcy, New York, in Oneida County.

## PARTIES

9.      Plaintiff TROY HENDRIX, a 36-year-old man who suffers from mental illness and a variety of physical ailments, is presently in the custody of the New York State Department of Corrections and Community Supervision in the Residential Mental Health Unit at Marcy Correctional Facility ("Marcy") in Marcy, New York.  Mr. Hendrix was, on the dates and times hereinafter mentioned, also confined in the Special Housing Unit at Downstate Correctional

4

Facility ("Downstate"), Five Points Correctional Facility ("Five Points"), Wende Correctional Facility ("Wende"), and Elmira Correctional Facility ("Elmira").  He was also confined in the Residential Mental Health Unit at Five Points.

## DEFENDANTS

10.     At all times relevant to Mr. Hendrix's causes of action, each Defendant named herein was employed by, and acted under color of law of, the State of New York.

### DOCCS Commissioner

11.     ANTHONY ANNUCCI, as Acting Commissioner of DOCCS (since approximately April 2013), is responsible for the care, custody, and control of all prisoners housed in DOCCS facilities.  The DOCCS Commissioner has final policy-making and supervisory authority within DOCCS and is personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Hendrix.

### DOCCS Deputy Commissioners

12.     The DOCCS Deputy Commissioners, as executive officers of DOCCS, have policy-making and supervisory authority within DOCCS and were or are personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Hendrix.

13.     The DOCCS Deputy Commissioners[3] include DR. JOHN MORLEY, DOCCS Deputy Commissioner & Chief Medical Officer; JAMES O'GORMAN, Deputy Commissioner for Correctional Facilities; DR. CARL KOENIGSMANN, former DOCCS Deputy Commissioner & Chief Medical Officer; JOSEPH BELLNIER, former DOCCS Deputy Commissioner for Correctional Facilities.

---

[3] The DOCCS Deputy Commissioners, along with the DOCCS Commissioner, will be referred to as the "DOCCS Commissioner Defendants."

<u>DOCCS Superintendents</u>

14.     The DOCCS Superintendents are responsible for the care, custody, and safety of all prisoners under their immediate jurisdiction.  PATRICK REARDON is DOCCS Superintendent of Marcy Correctional Facility, where Mr. Hendrix was and is housed in the RMHU.  Defendant Reardon has a policy-making and supervisory authority with regard to all operations at Marcy.  As Superintendent, he also reviewed disciplinary hearings resulting in solitary confinement penalties.

15.     JUSTIN THOMAS is the former DOCCS Superintendent of Marcy Correctional Facility, where Mr. Hendrix was and is housed in the RMHU.  At all relevant times, Defendant Thomas had a policy-making and supervisory authority with regard to all operations at Marcy.  As DOCCS Superintendent, he also reviewed disciplinary hearings resulting in solitary confinement penalties.

16.     JOHN COLVIN is the former DOCCS Superintendent of Five Points Correctional Facility, where Mr. Hendrix was also housed in the RMHU.  At all relevant times, Defendant Colvin had a policy-making and supervisory authority with regard to all operations at Five Points.  As DOCCS Superintendent, he also reviewed disciplinary hearings resulting in solitary confinement penalties.

17.     PAUL CHAPPIUS is the former DOCCS Superintendent of Elmira Correctional Facility where Mr. Hendrix was housed in SHU.  At all relevant times, Defendant Chappius had a policy-making and supervisory authority with regard to all operations at Elmira.  As DOCCS Superintendent, he also reviewed disciplinary hearings resulting in solitary confinement penalties.

DOCCS Special Housing Management Committee

18.     Upon information and belief, before April 2013, DOCCS utilized a Discretionary Review Committee ("DRC") at each facility to determine whether or not to grant a time cut to a person's SHU sentence under the Superintendent's discretionary authority.  Upon information and belief, in April 2013, DOCCS replaced the DRC with the Special Housing Management Committee ("SHMC"), which serves substantially the same function as the DRC, and is comprised of a Deputy Superintendent (to serve as a chairperson, lend guidance, and counsel staff), a SHU sergeant, a disciplinary lieutenant, and others designated by the Superintendent. Upon information and belief, while the SHMC is required by DOCCS directives to make "recommendations" to the Superintendent, in practice it exercised de facto power over time-cuts because Superintendents regularly rubber-stamped the determination without independent analysis.

19.     Hereinafter, the SHMC Defendants are: JOHN or JANE DOES 1-5, members of the DOCCS SHMC at Elmira during Mr. Hendrix's confinement at that facility; JOHN or JANE DOES 6-10, members of the DOCCS SHMC at Marcy during Mr. Hendrix's confinement at that facility; and JOHN or JANE DOES 11-15, members of the DOCCS SHMC at Five Points during Mr. Hendrix's confinement at that facility.[4]

## STATEMENT OF FACTS

### Mr. Hendrix's Background

20.     Mr. Hendrix has been continuously held in solitary confinement by Defendants since 2006, when he was 22 years old.  From 2006 through October 2017, Defendants held Mr. Hendrix in the SHU on the basis of Administrative Segregation ("Ad Seg").  Ad Seg is a type of

---

[4] Responses to FOIL requests have not revealed the identities of the members of the DOCCS SMHC at Elmira, Marcy, or Five Points.

solitary confinement imposed on prisoners who are alleged to pose a severe threat to the safety of prison staff or members of the general prison population. From October 2017 to present, Mr. Hendrix has been housed in the RMHU, both at Marcy and at Five Points.[5] He is currently 36 years old.

21.     Mr. Hendrix has a lifelong history of mental illness and disabling conditions. He was raised in a single-family home by his mother. Mr. Hendrix's father, who abandoned him at a young age, died over 20 years ago. Mr. Hendrix was diagnosed at age 14 with Bipolar Disorder. Since he was 11 or 12 years old, Mr. Hendrix has heard voices and has used drugs to self-medicate. He is also diagnosed with Antisocial Personality Disorder.

<u>Initial Placement in Administrative Segregation</u>

22.     On or about April 17, 2006, Mr. Hendrix was committed to the care and custody of DOCCS at the age of 22 at Downstate Correctional Facility, and was immediately placed into Ad Seg.

23.     The initial Ad Seg recommendation[6] from Deputy Inspector General, George Seyfert, stated that, "on January 19, 2006 while appearing in Brooklyn Supreme Court, Inmate Troy Hendrix . . . did leap across the defense table and try to grab a Court Officer's handgun. Inmate Hendrix committed this offense while armed with a plastic homemade knife. Inmate Hendrix committed this act in an attempt to escape, as his co-defendant . . . while armed with a plastic homemade knife and also attempting to escape, stabbed his own attorney with the knife.

---

[5] As discussed *infra*, Mr. Hendrix's transfer to the RMHU has not ameliorated the isolating conditions of his confinement.

[6] Mr. Hendrix has received two versions of his Ad Seg recommendation, one dated July 13, 2006 and another dated December 8, 2006. Both contain the same reason for his Ad Seg recommendation, but neither reflects the fact that Mr. Hendrix was placed in Ad Seg immediately upon his commitment to DOCCS custody.

Inmate Hendrix has shown himself to be an admitted escape risk and is a threat to the safety and security of any facility he is housed in."

24.     As a result of George Seyfert's recommendation, Mr. Hendrix was sent to the SHU where he was confined alone to a small cell for 23 hours per day.

25.     Along with imposing Ad Seg status, prison officials have authority to punish prisoners who break prison rules and regulations, or the law.  Officials may place these prisoners into disciplinary segregation as punishment.  However, prisoners may only be placed into disciplinary segregation for a specified time period following a disciplinary hearing.

26.     Confinement to the SHU on the basis of Ad Seg, on the other hand, is indefinite. Unlike those in disciplinary segregation, Mr. Hendrix remained in Ad Seg indefinitely, without a specified end date despite having a clean disciplinary record from 2012 to early 2020. Furthermore, the conditions that Mr. Hendrix faced in Ad Seg were identical to those of disciplinary segregation, even though Mr. Hendrix did not violate a single rule for the more than five continuous years he spent in Ad Seg.

Conditions of Solitary Confinement on the Basis of Ad Seg

27.     Mr. Hendrix spent over 11 years in solitary confinement on the basis of Ad Seg.

28.     While in Ad Seg, Mr. Hendrix was kept under conditions of extreme isolation, sensory deprivation, and restricted movement.  Unlike those in the general prison population, he was denied all work, cultural, and social opportunities.  He had severely limited recreational and religious opportunities, limited access to personal property, and limited contact with family and friends.

29.     In Ad Seg, Mr. Hendrix was confined to a small concrete cell for at least 23 hours per day.  He was permitted one hour of outdoor recreation each day, which took place in an empty cage—a pen enclosed by fencing with no other equipment or structure.  Mr. Hendrix had

9

neither access to group recreation nor the opportunity to interact with other people, even during the single hour of recreation.  Due to the limited nature of the outdoor recreation and because it was controlled by the guards, Mr. Hendrix chose instead to "create [recreation] within [his] head" and did not go outside at all for a number of years.

30.     Mr. Hendrix was further denied access to opportunities for group meals, group education, and group prayer.  He received all his meals through a slot in his door and ate alone in his cell.  Additionally, Mr. Hendrix was not permitted to attend therapeutic groups or programs for his mental health and behavioral needs.

31.     Mr. Hendrix had limited human interaction while in Ad Seg.  His only daily human interaction was usually with correctional officers or medical staff for a few minutes at a time.  Prior to April 2014, Mr. Hendrix was not allowed to receive phone calls.  After going six years without talking on the phone, he was permitted two 30-minute phone calls per month and could receive a visitor once every seven days.

32.     Mr. Hendrix was denied all in-person interaction with other prisoners in Ad Seg. He could not see the other prisoners.  The only way they could interact with each other was to yell to one another through the vents and steel doors separating their respective cells, for which they risked incurring disciplinary sanctions.

33.     Mr. Hendrix's personal property was limited during his Ad Seg confinement. While SHU occupants are allowed personal belongings, those allowances are more limited in Ad Seg than in disciplinary segregation.  Thus, even though Mr. Hendrix was not supposed to be penalized with disciplinary sanctions, his property was more restricted than that of someone who was subject to disciplinary penalties.

Transfer to the Residential Mental Health Unit

34.    On October 17, 2017, Mr. Hendrix was transferred from Ad Seg at Elmira to the RMHU at Marcy.  He was transferred to the Five Points RMHU on January 11, 2018, but was returned to the Marcy RMHU in January 2019.

35.    The RMHU was designed to "address the special needs of inmate-patients currently diagnosed with a serious mental illness . . . who due to their disciplinary status, are serving time in a Special Housing Unit[.]"[7]  As described above, Mr. Hendrix was never in SHU due to his disciplinary status.

36.    The conditions in the RMHU are not meaningfully different from the conditions in Ad Seg.  Indeed, Mr. Hendrix did not understand that his transfer to the RMHU was a "release" from Ad Seg until correctional officers told him after the fact.

37.    The main difference between RMHU and Ad Seg is that RMHU involves four hours of mental health and/or behavioral programming during each weekday.  During programming, RMHU residents are shackled to their desks unless they have achieved the highest level of privileges.  Some instructors allow prisoners to communicate during programming; others do not.

38.    Another difference is that in the RMHU, Mr. Hendrix is allowed to keep food in his cell.  The food available for purchase in the RMHU, however, is limited to junk food, as in Ad Seg.

39.    As he did in Ad Seg, Mr. Hendrix eats alone in the RMHU and receives all of his meals on a tray through a slot in his cell door.

---

[7] New York State Office of Mental Health and New York State Department of Correctional Services, *Residential Mental Health Unit Program Operations Description* at 3 (Dec. 7, 2009).

40.     In both Ad Seg and the RMHU, Mr. Hendrix is denied opportunities to participate in activities such as vocational training, group prayer, and group exercise.

41.     Mr. Hendrix's recreation in time in the RMHU is solitary, as it was in Ad Seg.

42.     DOCCS itself has acknowledged that Mr. Hendrix is still in Ad Seg despite his assignment to the RMHU.  In an Office of Mental Health report describing his transfers between the Marcy and Five Points RMHUs, two entries describe Mr. Hendrix as in the RMHU "with Adm. Seg. confinement."

43.     Furthermore, since being transferred to RMHU, Mr. Hendrix has continued to receive Ag Seg reviews.  While the RMHU manual states that a prisoner in RMHU is "not considered to be in SHU,"[8] the fact that he still receives Ad Seg reviews indicates otherwise for Mr. Hendrix.  For example, numerous reviews that occurred after Mr. Hendrix's October 17, 2017 RMHU transfer all state that "[t]he reason for AD-SEG placement has not changed."  The repeated rubber-stamping of Mr. Hendrix's Ad Seg reviews following his transfer to the RMHU indicates that DOCCS does not intend to release him to the general prison population.

<u>Failure to Conduct Meaningful Administrative Segregation Reviews</u>

44.     For over 11 years—from his April 2006 placement until his October 2017 transfer—Mr. Hendrix was in solitary confinement on the basis of Ad Seg.  Mr. Hendrix has been in the RMHU for nearly three years.

45.     Following his initial placement in Ad Seg, and in accordance with 7 N.Y.C.R.R. § 301.4, DOCCS was required to conduct a review of Mr. Hendrix's Ad Seg status every 60 days.  Section 301.4 requires the committee to review the prisoner's institutional record and write a report setting forth: "(i) reasons why the inmate was initially determined to be

---

[8] *Id.*

appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior

and attitude; and (iii) any other factors that they believe may favor retaining the inmate in or

releasing the inmate from administrative segregation."

46.     Section 301.4 changed to a 30-day review cycle in April 2017.  From that time to

present, Mr. Hendrix has not received an Ad Seg review every 30 days as is required by law.

47.     Furthermore, the reviews that Mr. Hendrix has received do not meaningfully

evaluate whether his Ad Seg status continues to be justified.

48.     Instead, the reviews contain substantially similar information and use formulaic,

boilerplate language that does not consider any changed circumstances since the prior review.

49.     From August 2012 to December 2019, Mr. Hendrix's reviews consisted of the

same recitation of his crime of conviction and a description of his attempt to escape from court.

50.     His October 19, 2012 review references four misbehavior reports issued to Mr.

Hendrix earlier that year.  It also conveyed that he had not had a disciplinary incident in the past

sixty days.

51.     Until very recently, none of Mr. Hendrix's subsequent reviews report even a

single instance of additional misbehavior, yet his Ad Seg status did not change.  Furthermore, his

Ad Seg status did not change even during periods of time when DOCCS acknowledged his

positive behavior.

52.     For example, his April 16, 2013 review states that Mr. Hendrix "should be

allowed out of cell time once a week for television viewing"—a privilege that rewards good

behavior.  Defendant Bellnier (former DOCCS Deputy Commissioner) nonetheless determined,

without providing any factual basis, that Mr. Hendrix must continue to remain in Ad Seg because

his release therefrom "would pose a grave threat to the safety and security of the facility."

53.     As another example, his August 13, 2013 review did not list any recent disciplinary transgressions.  To the contrary, it stated that, "in light of Hendrix's more positive custodial adjustment, the committee [*i.e.* the SMHC Defendants] concurs with the recommendation of the facility that Hendrix should continue to receive the additional out-of-cell time and commissary food item incentives."  Defendant Bellnier justified continuing to hold Mr. Hendrix in Ad Seg, however, "for the safety and security of the facility."

54.     Subsequent reviews continually acknowledged Mr. Hendrix's sustained good behavior and attitude.  His March 27, 2015 review stated that he is "soft spoken, polite and neat." He communicates appropriately with other inmates and line staff."  Despite the review's positive recognition, Defendant Bellnier again concluded, without providing any factual basis, that Mr. Hendrix's "placement in the general population would pose a threat to the safety and good order of the facility."

55.     Following his transfer to the RMHU, Mr. Hendrix's reviews continued to report positively on his manner and behavior.  His June 4, 2018 review describes that Mr. Hendrix "has continued to interact well with our executive and line staff.  His personal and cell hygiene continue to be appropriate if not excellent.  Inmate Hendrix's adjustment continues to be satisfactory with no disciplinary reports to review."  But this information did not matter, and the SMHC Defendants recommended and Defendant O'Gorman (Deputy Commissioner for Correctional Facilities) decided that Mr. Hendrix's "placement in Ad Seg is appropriate."

56.     Mr. Hendrix's December 6, 2019 review is another example in the pattern of his positive behavior going unrewarded.  This review states that "[h]e is seen routinely on rounds by Executive and multiple Security staff; he has appropriate conversations and openly raises any questions he has with them."  It also reports that Mr. Hendrix "is successfully attending group

14

programming" and that he "continues to be well behaved and demonstrate positive behavior." The review, however, relies on decades-old information to justify Mr. Hendrix's continued Ad Seg placement.  Although he "has adjusted well to the less restrictive environment at the RMHU," the review recommends continued Ad Seg placement "[d]ue to his significant violent and unpredictable historical behavior."

57.     As these examples indicate, Mr. Hendrix's reviews do not reflect any new negative information about Mr. Hendrix's conduct.  From 2012 through 2020, the review committee copied nearly verbatim the description of Mr. Hendrix's crime of conviction and his escape attempt and cited these incidents that occurred in 2006 as part of the justification for his continued placement in solitary confinement.

58.     The SMHC Defendants and Defendants Bellnier and O'Gorman have continually disregarded Mr. Hendrix's good behavior in light of his "past wanton and egregious disregard for the rules of society."  Mr. Hendrix's March 26, 2020 and May 26, 2020 Ad Seg reviews both report that "[t]he reason for AD-SEG placement has not changed."  The reviews again describe Mr. Hendrix's escape attempt—which, at this point, occurred *14 years ago*—and state that it "will never been taken lightly by DOCCS."  This is tantamount to an admission that DOCCS plans to continue Mr. Hendrix's unconstitutional confinement indefinitely.

                    Medical and Mental Health Consequences of Solitary Confinement

59.     Mr. Hendrix has serious physical and mental conditions that have been caused or exacerbated by his ten-plus years of continued isolated confinement.

60.     In addition to being deprived of the minimal civilized measure of life's necessities as described above, Mr. Hendrix also experiences unrelenting and crushing mental anguish, as well as physical pain and suffering as a result of the years he has spent without normal human interaction in stark and restrictive conditions, without any hope of release or relief.

61.     The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating psychological harm.  Mental health professionals have repeatedly and strongly cautioned against the use of solitary confinement in light of the serious, often irreversible, damage it causes.  The Supreme Court has recognized that research "confirms what th[e] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."[9]

62.     Even brief periods of solitary confinement can result in serious and debilitating physical consequences.[10]  Individuals held in solitary confinement for even a short period of time commonly experience problems such as sleep disturbances, diaphoresis (excessive sweating, as experienced by people in shock), back pain, joint pain, deterioration of eyesight, and shaking, as well as the aggravation of pre-existing medical conditions.[11]

63.     Prolonged solitary confinement also causes severe psychiatric harm.  Those held in solitary confinement may experience hypersensitivity to external stimuli, auditory and visual hallucinations, panic attacks, obsessive thoughts, paranoia, and decreased impulse control.[12]

64.     Mr. Hendrix has experienced many of these physical conditions including irritability, appetite loss, delusions, sleeplessness, depression, sensitivity to light, aggravation of

---

[9] *See Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) ("Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.") (quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006)).

[10] *See* Craig Haney's testimony and the Statement of the Physicians for Human Rights made and submitted to the Senate Judiciary Committee on the Constitution, Civil Rights and Human Rights Hearing on Solitary Confinement, June 19, 2012.  Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 12–13 (2012), available at https://www.judiciary.senate.gov/imo/media/doc/12-6-19HaneyTestimony.pdf.

[11] *See* Physicians for Human Rights, Buried Alive: Solitary Confinement in the US Detention System 1–2 (April 2013), available at https://phr.org/wp-content/uploads/2013/04/Solitary-Confinement-April-2013-full.pdf.

[12] *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y at 333.

his asthma, and arthritic pain and stiffness in his knee.  While he was housed at Five Points from December 2006 to June 2011, Wende from June 2011 to July 2012, and Elmira from July 2012 to October 2017, the light in Mr. Hendrix's cell was left on every night, from 7 p.m. to 6 a.m. This perpetual light exposure caused Mr. Hendrix to develop photophobia, an extreme sensitivity to light that requires that he wear dark tinted glasses to avoid pain.  Photophobia is not curable.

65.      Serious forms of mental illness can either develop from or be exacerbated by even short periods of isolation.  The symptoms of these illnesses include: significantly increased negative attitudes and affect, irritability, anger, aggression, rage, fear of impending emotional breakdowns, a loss of control, and panic attacks.[13]

66.      Mr. Hendrix is diagnosed with Axis I Bipolar Disorder and Antisocial Personality Disorder.  He was permitted to receive mental health programming between early 2008 and mid-2013.  From mid-2013 until his transfer to the RMHU in October 2017, Mr. Hendrix was denied mental health programming because he was in Ad Seg for alleged disciplinary reasons.  Mr. Hendrix's mental health programming did not resume until 2017 when he was transferred to the RMHU.  The extreme isolation has caused his mental health to deteriorate, causing Mr. Hendrix to suffer increased anxiety, hypersensitivity, bouts of depression, delusional thinking, mood swings, hearing voices, and sleeplessness.

Mr. Hendrix Has Exhausted All Administrative Remedies

67.      Mr. Hendrix has exhausted administrative remedies, submitting grievances based on his subjection to solitary confinement on the basis of his long-ago misconduct—despite a recognized pattern of good behavior thereafter—and appealing the denials of such grievances.

---

[13] *See* Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 10–11 (2012).

68.     In October 2016 and February 2017, while housed in SHU at Elmira Correctional

Facility, Mr. Hendrix submitted grievances challenging his continuous and ongoing solitary

confinement through DOCCS's Inmate Grievance Program.  He received responses from the

Inmate Grievance Review Committee denying his grievances.  He appealed to the Elmira

Superintendent, who also denied his grievances.  He then appealed the Superintendent's

decisions to the Central Office Review Committee of the Inmate Grievance Program, which

issued a final denial of his grievances on January 1, 2018.

<u>Our Evolving Standards of Decency Demand Significant Limits on the Use of Prolonged<br>Solitary Confinement</u>

69.     Recognizing the severe and often irreversible harm caused by solitary

confinement, a wide range of highly-regarded professional groups and international

organizations have publicly announced their commitment to sharply limiting or abolishing

solitary confinement.  Medical health professional associations, legal organizations, prisoner re-

entry organizations, correctional organizations, religious organizations, and international human

rights bodies echo scientific research admonishing the use of solitary confinement.

70.     The nation's most highly regarded medical health professional organizations have

condemned the use of solitary confinement, particularly its use on adolescents and those with

mental illness.

71.     The American Psychiatric Association has stated that, with "rare exception,"

prisoners with mental illnesses should never be subjected to prolonged isolation, due to the real

and serious potential for harm.[14]  The American Academy of Child and Adolescent Psychiatry

---

[14] *See* American Psychiatric Association, *APA Position Statement on Segregation of Prisoners with Mental Illness* (2012), available at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Psychiatric-Services-in-Adult-Correctional-Facilities.pdf.

has similarly recognized "the potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis."[15]

72.     Notably, the National Commission on Correctional Health Care ("NCCHC") has declared that solitary confinement for longer than 15 consecutive days is "cruel, inhumane and degrading treatment, and harmful to an individual's health," and advises that "[h]ealth care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided."[16]  In its Position Statement on Solitary Confinement, the NCCHC reports that "[t]hose in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."[17]

73.     Professional legal organizations recommend serious restrictions on the use of solitary confinement.  The New York State Bar Association has stated that "solitary confinement, if used at all, should be measured in *days*, not years, months, or even weeks."[18] The American Bar Association has stated that only the most severe disciplinary offenses, in which safety and security are seriously threatened, ordinarily warrant a sanction that exceeds 30 days' placement in disciplinary housing.[19]

---

[15] *See* Solitary Confinement of Juvenile Offenders (Approved by Council, Apr. 2012), available at https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y, 325, 325-83 (2006)).

[16] National Commission on Correctional Healthcare, *Solitary Confinement (Isolation)* (2016), available at https://www.ncchc.org/solitary-confinement.

[17] *Id.*

[18] *See* N.Y. State B. Ass'n. Comm. On Civ. Rts. Report to the House of Delegates, *Solitary Confinement in New York* State, 1, 21 (Approved on Jan. 25, 2013) available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (emphasis in original).

[19] American Bar Association, Standards on Treatment of Prisoners (2011), available at https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.pdf.

74.     International human rights bodies have condemned the use of solitary confinement and issued direct pleas to the United States to halt its continued use of the practice. The United Nations Special Rapporteur on Torture has concluded that 15 days in solitary confinement is considered cruel, inhuman, or degrading treatment or punishment—in other words, torture.[20]  The United Nations Committee Against Torture has expressed great concern over the frequent use of prolonged isolation and has recommended the United States "[l]imit the use of solitary confinement as a measure of last resort, for as short a time as possible[.]"[21]

75.     Religious leaders from diverse spiritual backgrounds are also united against the continued use of solitary confinement.[22]

76.     Nationwide, state and federal legislators have responded to the growing call to abolish the practice of solitary confinement.  The Senate Judiciary Subcommittee on the Constitution, Human Rights, and Civil Rights has held a series of congressional hearings to investigate the widespread use of solitary confinement and the attending harms.[23]

---

[20] *See* Juan E. Mendez, Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011) available at https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElement.

[21] *See* U.N. Comm. Against Torture, Concluding Observations on the Combined Third to Fifth Periodic Reports of United States of America (Dec. 19, 2014), available at https://digitallibrary.un.org/record/790513?ln=en#record-files-collapse-header.

[22] *See, e.g.*, Francis X. Rocca, National Catholic Reporter, Pope Francis Calls for Abolishing Death Penalty and Life Imprisonment (Oct. 23, 2014) ), available at https://www.ncronline.org/blogs/francis-chronicles/pope-francis-calls-abolishing-death-penalty-and-life-imprisonment; 220th General Assembly of the Presbyterian Church (USA), Commissioner's Resolution on Prolonged Solitary Confinement in U.S. Prisons (2012), available at https://www.pc-biz.org/#/search/4389; The Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (Passed by the Rabbinical Assembly Plenum May 2012), available at https://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation..

[23] *See* U.S. S. Judiciary Subcomm. on Const., Human Rights, & Civ. Rts., Hearing on "Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012; Feb. 25, 2014), available at https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-the-human-rights-fiscal-and-public-safety-consequences and

77.    DOCCS has already acknowledged the harms caused by solitary confinement and agreed to limit its use of the practice in some contexts and for some populations.

78.    In the *Peoples v. Fischer* settlement, DOCCS acknowledged the harm SHU causes and agreed to systemic changes including providing progressive behavioral incentives for prisoners in SHU, more beds in behavioral alternative units, and guidelines for Hearing Officers to consider when imposing SHU sanctions.[24]

79.    While a step in the right direction for disciplinary segregation, the *Fisher* settlement provides no relief to prisoners placed in solitary confinement under Ad Seg status.[25] As Mr. Hendrix's ordeal shows, solitary confinement under such a regime can persist for years without any meaningful review.

## LEGAL CLAIMS

### I.    FIRST CAUSE OF ACTION (ALL DEFENDANTS)
Violations Of The Eighth Amendment For Imposing Cruel And Unusual
Punishments That Contravene Standards Of Decency

80.    Mr. Hendrix repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

81.    At all relevant times, each of the Defendants acted under color of state law.

82.    Mr. Hendrix was at all times dependent on the Defendants to protect him from harm and to provide for his basic needs.

---

https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-ii-the-human-rights-fiscal-and-public-safety-consequences..

[24] *See* Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694, (S.D.N.Y. Apr. 1, 2016), ECF No. 331.

[25] *Id*. at 28 ("Nothing in this section precludes the continued selective use of Protective Custody or Administrative Segregation in accordance with established procedures.").

83.     The acts and omissions of the Defendants, which resulted in Mr. Hendrix's continuous solitary confinement for over 11 years contravene standards of decency against the use of long-term solitary confinement.

84.     By their use of the policies and practices described herein, the Defendants caused Mr. Hendrix to suffer severe harm by knowingly disregarding the substantial risk that being confined in solitary confinement would deprive Mr. Hendrix of life's necessities, basic human dignity, and the right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

85.     The Defendants' actions have deprived Mr. Hendrix of basic human needs, such as normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.  Extremely prolonged deprivation of these basic human needs has inflicted serious psychological and physical pain and suffering, as well as permanent psychological and physical injury on Mr. Hendrix.  This deprivation of basic human needs, resulting from the cumulative effect of extremely prolonged isolated confinement and the crushing conditions of that confinement, poses a continuing serious and substantial risk of harm.

86.     The risk of harm that Mr. Hendrix faced and continues to face by being placed in solitary confinement was and continues to be so obvious that knowledge may be inferred under these circumstances.  It was patently obvious to the Defendants, and to any reasonable person, that the conditions imposed on Mr. Hendrix over many years would cause tremendous mental anguish, suffering, and pain.

87.     The Defendants' deliberate indifference to Mr. Hendrix's pain and suffering constitutes more than mere negligence because the Defendants were repeatedly and explicitly

made aware, through administrative grievances and written complaints, that Mr. Hendrix was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement.  As such, these circumstances fully support the conclusion that the Defendants had knowledge of the risk of harm that Mr. Hendrix faced in solitary confinement.

88.     The policies and practices complained of herein have been implemented by the Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

89.     All Defendants are sued in an individual and official capacity for declaratory and injunctive relief, as each Defendant knowingly allowed the policies and customs that permitted these Eighth Amendment violations to continue under their supervision and authority.  The DOCCS Superintendent and the SHMC Defendants are also sued in an individual capacity for monetary relief for subjecting Mr. Hendrix to cruel and unusual punishment that contravenes standards of decency.

## II.     SECOND CAUSE OF ACTION (ALL DEFENDANTS)
Violations of The Eighth Amendment For Imposing
Grossly Disproportionate Sentences To Solitary Confinement That
Serve No Legitimate Penological Purposes

90.     Mr. Hendrix repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

91.     The Defendants' policy of indefinite and prolonged isolated confinement imposed disproportionate punishment on Mr. Hendrix.  The Defendants had no legitimate penological interest in retaining Mr. Hendrix in the debilitating conditions of solitary confinement.

92.     By their acts and omissions, the Defendants have subjected Mr. Hendrix to a decade-long solitary confinement and infliction of significant psychological and physical harm and have subjected him to the risk of future debilitating harm although he has not committed any

serious infraction since his initial placement in Ad Seg.  This confinement serves no legitimate, penological purpose and is a grossly disproportionate punishment, which violates Mr. Hendrix's Eighth Amendment right to be free from cruel and unusual punishment.

93.     All of the Defendants are sued in an individual and official capacity for declaratory and injunctive relief, as each Defendant knowingly allowed the policies and customs that permitted such violations of the Eighth Amendment to continue under their supervision and authority.  The DOCCS Superintendent and the SHMC Defendants are also sued in their individual capacity for monetary relief for subjecting Mr. Hendrix to grossly disproportionate terms of solitary confinement.

### III.     THIRD CAUSE OF ACTION (ALL DEFENDANTS)
Violations Of The Fourteenth Amendment Right To
Procedural Due Process For Lack of Meaningful Review

94.     Mr. Hendrix repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

95.     The Defendants have deprived Mr. Hendrix of a protected liberty interest in avoiding long-term solitary confinement.  The SHMC Defendants have denied Mr. Hendrix of both meaningful and timely periodic review of his detention in Ad Seg, as well as meaningful notice of what he must do to earn release, in violation of the Fourteenth Amendment.

96.     Because indefinite placement in Ad Seg constitutes a significant and uncommon hardship, Mr. Hendrix is entitled to meaningful notice of how he may alter his behavior to rejoin the general prison population, as well as meaningful and timely periodic reviews to determine whether he still warrants detention in Ad Seg.

97.     The SHMC Defendants have denied Mr. Hendrix of any such notice or meaningful review by: (1) failing to provide Mr. Hendrix with notice of what he can do to get

released from Ad Seg; (2) providing misleading notice that he can become eligible to be released

from Ad Seg by maintaining "positive" behavior for a significant period, when in fact Mr.

Hendrix had maintained positive behavior and was still housed in Ad Seg; (3) making a

predetermination that Mr. Hendrix will stay in Ad Seg, thus rendering the periodic reviews

procedurally meaningless; (4) failing to consider Mr. Hendrix's changes in behavior over time

and whether he remained a security risk to justify his continuous confinement in Ad Seg; and (5)

failing to conduct timely reviews and/or provide him with those reviews, thus precluding him

from responding, participating, or providing additional information and precluding the review

committee themselves from conducting meaningful review.

98.     The Defendants' actions are in violation of Mr. Hendrix's due process rights

under the Fourteenth Amendment to the United States Constitution.

99.     All of the Defendants are sued in an individual and official capacity for

declaratory and injunctive relief, as each Defendant knowingly permitted policies and customs

that violated the Fourteenth Amendment right to due process to continue.  The DOCCS

Superintendent and the SHMC Defendants are also sued in their individual capacity for monetary

relief for depriving Mr. Hendrix of his due process right to meaningful review.

## IV.   FOURTH CAUSE OF ACTION (DOCCS COMMISSIONER DEFENDANTS)
### Violations of the *Americans with Disabilities Act*

100.     Mr. Hendrix repeats and incorporates the allegations set forth in all of the

foregoing paragraphs of this Complaint as though fully set forth herein.

101.     Mr. Hendrix is a qualified individual with disabilities as defined in the Americans

with Disabilities Act (ADA).  He has mental and physical impairments that substantially limit

one or more major life activities; he has records of these impairments and is regarded as having

such impairments.  42 U.S.C. § 12102(2); 42 U.S.C § 12131(2).  Mr. Hendrix is diagnosed with

Antisocial Personality Disorder and Bipolar Disorder.  His medical and mental health records at DOCCS facilities document these diagnoses.

102.    Mr. Hendrix is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody within the meaning of Title II of the ADA.  By virtue of his confinement in Ad Seg, Mr. Hendrix is precluded from participating in services, programs and activities and from receiving any benefits provided to incarcerated people in DOCCS custody.

103.    The DOCCS Commissioner Defendants violate the ADA by failing to ensure that Mr. Hendrix, a qualified individual with disabilities as defined by the ADA, has access to, is permitted to participate in, and is not denied the benefits of, programs, service and activities provided by Defendants.  42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

104.    The DOCCS Commissioner Defendants violate the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination against Mr. Hendrix on the basis of his disability.  28 C.F.R. §§§ 35.130(b)(7).

105.    The DOCCS Commissioner Defendants discriminate against Mr. Hendrix, a qualified individual with disabilities as defined by the ADA, by administering programs and services in a manner that denies Mr. Hendrix the opportunity to receive services in the most integrated setting appropriate to his needs.  28 C.F.R. § 35.152(b)(2).

106.    The DOCCS Commissioner Defendants utilize criteria or methods of administration that have the effect of subjecting Mr. Hendrix to discrimination and that defeat or substantially impair accomplishment of objectives of DOCCS programs, services, and activities. 28 C.F.R. § 35.130(b)(3).

107.     As a result of the DOCCS Commissioner Defendants' policies and practices, Mr. Hendrix has been unnecessarily placed and retained in isolation due to his disabilities; is denied equal access to activities, programs, and services for which he is otherwise qualified; and is denied the opportunity to receive services in the most integrated setting appropriate to his needs.

108.     As a direct and proximate cause of these actions and omissions, Mr. Hendrix has suffered and will continue to suffer from harm and violation of his ADA rights.  These harms will continue unless enjoined by this Court.

### V.    FIFTH CAUSE OF ACTION (DOCCS COMMISSIONER DEFENDANTS)
Violations of Section 504 of the *Rehabilitation Act*

109.     Mr. Hendrix repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

110.     Mr. Hendrix is an individual with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. §§705(20), 794.  Mr. Hendrix is diagnosed with Antisocial Personality Disorder, Bipolar Disorder, and Schizophrenia.  His medical and mental health records at numerous DOCCS facilities document these diagnoses.

111.     Mr. Hendrix is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody within the meaning of Section 504 of the Rehabilitation Act.

112.     DOCCS is a program or activity receiving federal financial assistance within the meaning of the Rehabilitation Act.  29 U.S.C. § 794.

113.     The DOCCS Commissioner Defendants exclude Mr. Hendrix from participation in, and denies him the benefits of, programs or activities, by reason of his disabilities.  29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a).

27

114.     The DOCCS Commissioner Defendants discriminate against Mr. Hendrix, a qualified individual with disabilities within the meaning of the Rehabilitation Act, by administering programs and services for individuals with disabilities in a manner that denies Mr. Hendrix the opportunity to receive services in the most integrated setting appropriate to his needs.  29 U.S.C. § 794; 45 C.F.R. § 84.4(b)(2).

115.     The DOCCS Commissioner Defendants deny Mr. Hendrix the opportunity afforded him to participate in programs or activities.  28 C.F.R. § 42.503(b)(1).

116.     The DOCCS Commissioner Defendants utilize criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of DOCCS programs or activities with respect to handicapped persons.  28 C.F.R. § 42.503(b)(3).

117.     The DOCCS Commissioner Defendants violate Section 504 of the Rehabilitation Act by failing to reasonably accommodate Mr. Hendrix, a qualified individual with disabilities within the meaning of the Rehabilitation Act, in its facilities, programs, activities, and services.

118.     As a result of the DOCCS Commissioner Defendants' discrimination and failure to provide reasonable accommodations, Mr. Hendrix does not have equal access to DOCCS activities, programs, and services for which he is otherwise qualified.

119.     As a direct and proximate cause of these policies, practices, and omissions, Mr. Hendrix has suffered and will continue to suffer from harm and violation of his rights under Section 504 of the Rehabilitation Act.  These harms will continue unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff TROY HENDRIX respectfully asks that this Court:

1.     Declare that the Defendants' acts and omissions violated and continue to violate Mr. Hendrix's constitutional rights under the Eighth and Fourteenth Amendments

to the United States Constitution, the ADA, and Section 504 of the Rehabilitation Act, and that these acts and omissions continue to cause an ongoing harm and violation of those rights;

2.   Issue injunctive relief ordering Defendants to release Mr. Hendrix from solitary confinement in the RMHU or otherwise ameliorate the conditions under which Mr. Hendrix is held and provide him with effective mental health treatment and programming;

3.   Enter judgment in favor of Mr. Hendrix for reasonable actual and compensatory, including consequential, damages against each of the Defendants, jointly and severally, to compensate Mr. Hendrix for his pain, suffering, and other hardships arising from the Defendants' deliberate indifference to his medical needs and due process violations;

4.   Enter judgment for Mr. Hendrix for reasonable punitive damages against each of the Defendants;

5.   Award Mr. Hendrix the costs of this action, including reasonable attorneys' fees;

6.   Retain jurisdiction of this case until the Defendants have fully complied with the orders of this Court; and

7.   Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: July 2, 2020
New York, New York

By: */s/ James D. Arden*

James D. Arden
Cassandra Liu
Mariah M. Vitali
SIDLEY AUSTIN LLP
787 Seventh Ave
New York, NY 10019
Telephone: (212) 839-5889
jarden@sidley.com
cassandra.liu@sidley.com
mvitali@sidley.com