UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

TROY HENDRIX,

                          Plaintiff,

v.                                                              9:20-CV-0743
                                                                (GTS/TWD)
ANTHONY J. ANNUCCI, Acting Commissioner,
Department of Corrections and Community
Supervision; JAMES O'GORMAN, Deputy
Commissioner for Correctional Facilities; JOSEPH
BELLNIER, former DOCCS Deputy Commissioner
for Correctional Facilities; PATRICK REARDON,
Superintendent of Marcy Correctional Facility;
JUSTIN THOMAS, former Superintendent of Marcy
Correctional Facility; JOHN COLVIN, former
Superintendent of Five Points Correctional Facility;
PAUL CHAPPIUS, former Superintendent of Elmira
Correctional Facility; JOHN or JANE DOES 1-5,
members of the DOCCS SHMC at Elmira
Correctional Facility; JOHN or JANE DOES
6-10, members of the DOCCS SHMC at Marcy
Correctional Facility; JOHN or JANE DOES 11-15,
members of the DOCCS SHMC at Five Points;

                          Defendants.

_____

APPEARANCES:                                          OF COUNSEL:

SIDLEY AUSTIN LLP                                 JAMES D. ARDEN, ESQ.
  Counsel for Plaintiff                                  CASSANDRA LIU, ESQ.
787 Seventh Ave.
New York, NY 10019

HON. LETITIA A. JAMES                           DENISE P. BUCKLEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this prisoner civil rights action filed by Troy Hendrix ("Plaintiff") against Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") Anthony J. Annucci ("Defendant Annucci"), DOCCS Deputy Commissioner for Correctional Facilities James O'Gorman ("Defendant O'Gorman"), former DOCCS Deputy Commissioner for Correctional Facilities Joseph Bellnier ("Defendant Bellnier"), Superintendent of Marcy Correctional Facility ("Marcy C.F.") Patrick Reardon ("Defendant Reardon"), former Superintendent of Marcy C.F. Justin Thomas ("Defendant Thomas"), former Superintendent of Five Points Correctional Facility ("Five Points C.F.") John Colvin ("Defendant Colvin"), former Superintendent of Elmira Correctional Facility ("Elmira C.F.") Paul Chappius ("Defendant Chappius"), and John or Jane Does 1-15 ("Defendants John or Jane Does")[1] (collectively, "Defendants"), is Defendants' motion to dismiss parts of Plaintiff's Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[2]  (Dkt. No. 48, Attach. 1 [Defs.' Memo. of Law].)  For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

## I.   RELEVANT BACKGROUND

### A.   Plaintiff's Amended Complaint

Generally, liberally construed, Plaintiff's Amended Complaint asserts five claims against Defendants: (1) a claim against all Defendants for inadequate conditions of confinement in

---

[1]         Defendants John or Jane Does 1-15 refer to fifteen unnamed DOCCS prison guards assigned to Special Housing Management Committees ("SHMC") at various DOCCS correctional facilities during Plaintiff's confinement at those respective facilities.  Specifically, John or Jane Does 1-5 were members of the SHMC at Elmira C.F., John or Jane Does 6-10 were members of the SHMC at Marcy C.F., and John or Jane Does 11-15 were members of SHMC at Five Points C.F.  (Dkt. No. 42, at ¶¶ 23-24.)

[2]         Defendants' motion to dismiss was filed on behalf of the seven (7) named Defendants, not Defendants John or Jane Does 1-15.  (Dkt. No. 48, Attach. 1, at 5 [Defs.' Mem. of Law].)

violation of the Eighth Amendment;[3] (2) a claim against all Defendants for grossly

disproportionate sentences of solitary confinement in violation of the Eighth Amendment;[4] (3) a

claim against all Defendants for a lack of timely and meaningful periodic reviews in violation of

the Fourteenth Amendment's Due Process Clause;[5] (4) a claim against Defendants Annucci,

O'Gorman, and Bellnier (collectively, "the DOCCS Commissioner Defendants"), in their official

capacities, for a violation of Title II of the Americans with Disabilities Act of 1990 ("ADA");

and (5) a claim against the DOCCS Commissioner Defendants, in their official capacities, for a

violation of Section 504 of the Rehabilitation Act.  (Dkt. No. 42, at ¶¶ 99-134 [Pl.'s Am.

Compl.].)

Generally, in support of these claims, Plaintiff's Amended Complaint alleges as follows:

(1) between April 2006 and October 2017, on the basis of administrative segregation ("Ad Seg"),

Plaintiff was incarcerated in solitary confinement in numerous DOCCS' Special Housing Units

("SHU") located throughout multiple correctional facilities, including (i) between April 2006

and December 2006, when Plaintiff was incarcerated at Downstate Correctional Facility's

("Downstate C.F.") SHU, (ii) between December 2006 and June 2011, when Plaintiff was

incarcerated at Five Points C.F.'s SHU, (iii) between June 2011 and July 2012, when Plaintiff

was incarcerated at Wende Correctional Facility's ("Wende C.F.") SHU, (iv) between July 2012

---

[3]      Any defendant who is a current New York State employee is sued in his or her official capacity for declaratory and injunctive relief.  Additionally, Defendants are sued in their individual capacities for monetary damages.  (Dkt. No. 42, at 28 [Pl.'s Am. Compl.].)

[4]      Any defendant who is a current New York State employee is sued in his or her official capacity for declaratory and injunctive relief.  Additionally, Defendants are sued in their individual capacities for monetary damages.  (Dkt. No. 42, at 29 [Pl.'s Am. Compl.].)

[5]      Any defendant who is a current New York State employee is sued in his or her official capacity for declaratory and injunctive relief.  Additionally, Defendants are sued in their individual capacities for monetary damages.  (Dkt. No. 42, at 30-31 [Pl.'s Am. Compl.].)

3

and October 2017, when Plaintiff was incarcerated at Elmira C.F.'s SHU, (v) between October 2017 and present, when Plaintiff has either been incarcerated at Five Points C.F.'s Residential Mental Health Unit ("RMHU") or Marcy C.F.'s RMHU, and (vi) the present time, when Plaintiff is incarcerated at Marcy C.F.'s RMHU;[6] (2) Plaintiff's SHU incarceration has never been due to his disciplinary status; (3) following a disciplinary hearing to determine whether an inmate has violated the law, or prison rules and regulations, prison officials can incarcerate that inmate in a SHU for a specified period of time; (4) an inmate can be incarcerated in SHU on an Ad Seg basis for an indefinite period of time; (5) at each DOCCS correctional facility, a Special Housing Management Committee ("SHMC")[7] is tasked with reviewing whether an inmate incarcerated under an Ad Seg status should remain an Ad Seg inmate or be removed from Ad Seg and placed into the prison's general population; (6) between April 2006 and April 2017, in accordance with 7 N.Y.C.R.R. § 301.4, SHMCs were required to conduct reviews of Ad Seg inmates every sixty days; (7) beginning in April 2017, 7 N.Y.C.R.R. § 301.4 was amended such that SHMCs were required to conduct reviews of Ad Seg inmates every thirty days; (8) under 7 N.Y.C.R.R. § 301.4, an SHMC was required to write a report highlighting the inmate's institutional record, including (i) reasons why the inmate was initially determined to be appropriate for Ad Seg, (ii) information on the inmate's subsequent behavior and attitude, and (iii) any other factors that the

---

[6]      According to the Amended Complaint, an inmate confined in a SHU spends twenty-three hours per day in their own cell.  SHU inmates are permitted one hour of daily outdoor recreation in which they are placed into an empty holding area without any other inmates or equipment. SHU inmates have limited opportunities to participate in work, cultural, religious, and social activities.  RMHU was designed to address the special needs of SHU inmates diagnosed with a serious mental illness.  There are slight variations between SHU and RMHU.  For example, RMHU inmates participate in four hours of mental health and behavioral programming each weekday and are permitted to keep snack food in their cell.

[7]      Each SHMC is comprised of DOCCS employees, including, a deputy superintendent, a SHU sergeant, a disciplinary lieutenant, and employees designated by the facility's superintendent.

SHMC thought may favor retaining the inmate in Ad Seg or releasing the inmate from Ad Seg;
(9) Plaintiff's periodic Ad Seg reviews were not conducted in the required frequency; (10)
between August 2012 and December 2019, Plaintiff's Ad Seg reviews consisted of an identical
recitation of his prior criminal history and attempted escape in Brooklyn Supreme Court;[8] (11)
Plaintiff's periodic Ad Seg reviews have described generally improved behavior, including (i)
the fact that, on April 16, 2013, Plaintiff's good behavior led Elmira C.F.'s SHMC to believe
Plaintiff "should be allowed out of cell time once [per] week for television viewing," (ii) the fact
that, on August 13, 2013, Plaintiff's "positive custodial adjustment" led Elmira C.F.'s SHMC to
believe that Plaintiff "should continue to receive the additional out-of-cell time and commissary
food item incentives," (iii) the fact that, on March 27, 2015, Plaintiff's demeanor was
documented to be "soft spoken, polite and neat," while also communicating well with prison
staff, and (iv) on June 4, 2018, Plaintiff "continued to interact well with [DOCCS] executive and
line staff.  His personal and cell hygiene continue to be appropriate if not excellent.  [Plaintiff's]
adjustment continues to be satisfactory with no disciplinary reports to review;" (12)
notwithstanding Plaintiff's improved behavior, as documented on his periodic Ad Seg reviews,
Defendants O'Gorman, Bellnier, and John or Jane Does 1-15 refused to allow for Plaintiff's
transfer out of Ad Seg and into general population; (13) as an Ad Seg inmate, Plaintiff had
limited human interaction which typically occurred only with DOCCS correctional officers or
medical staff;[9] (14) to justify Plaintiff's continued Ag Seg status, Defendants used and inserted

---

[8]    Plaintiff concedes that an Ad Seg review dated October 19, 2012, references four
misbehavior reports that had been issued earlier in 2012.  Plaintiff does not include information
describing the conduct giving rise to the issuance of the four misbehavior reports.

[9]    Between April 2006 and April 2014, Plaintiff was not permitted to make phone calls.
Beginning in April 2014, Plaintiff was allotted two 30-minute phone calls per month, and was
permitted to have one visitor per week.

formulaic and boilerplate language into the periodic Ad Seg reviews; (15) Defendants' use of

formulaic and boilerplate language constitutes a failure to conduct a meaningful evaluation of

whether a continuance of Plaintiff's Ad Seg status was justified; (16) as a result of his Ad Seg

status, Plaintiff's solitary confinement has caused him to suffer from physical and emotional

trauma, including photophobia,[10] exacerbated asthma, arthritis in his knee, a toe infection that

has required two surgeries, and has worsened his antisocial personality disorder and bipolar

disorder diagnoses;[11] and (17) Plaintiff has exhausted all available administrative remedies to

help him seek justice.  (Dkt. No. 42, at 5-23 [Pl.'s Am. Compl.].)

For these violations, Plaintiff seeks sevens forms of relief: (1) a declaration that

Defendants' acts and omissions violated (and continue to violate) Plaintiff's constitutional rights

under the Eighth and Fourteenth Amendments, Title II of the ADA and Section 504 of the

Rehabilitation Act, and these acts and omissions cause ongoing harm; (2) an injunction that

either (a) orders Plaintiff's release from the RMHU, or (b) ameliorate his current confinement

conditions and provide him with effective mental health treatment and programming; (3) a

judgment granting Plaintiff reasonable, actual and compensatory (including consequential)

damages from each Defendant, jointly and severally, to compensate Plaintiff for his pain and

suffering; (4) a judgment granting Plaintiff reasonable punitive damages from each Defendant;

(5) an order awarding Plaintiff costs for this action (including reasonable attorneys' fees); (6) an

order retaining jurisdiction over this action until Defendants have fully complied with the orders

of the Court; and (7) an order granting any other relief that the Court deems just and proper.  (*Id.*

---

[10]      Photophobia is an incurable, severe sensitivity to light, which Plaintiff developed because lights are kept on in his cell for most of the day and night.

[11]      In addition, Plaintiff's mental health has deteriorated to the point where he suffers from "anxiety, hypersensitivity, bouts of depression, delusional thinking, mood swings, hearing voices, and sleeplessness."

at Prayer for Relief ¶¶ 1-7.)  More specifically, with respect to his Eighth Amendment claims and Fourteenth Amendment claim, Plaintiff seeks declaratory and injunctive relief from all Defendants who are sued in their official capacity and monetary relief from all Defendants who are sued in their individual capacity.  (*Id*. at ¶¶ 99-119.)

### B.    Parties' Briefing on Defendants' Motion

### 1.    Defendants' Memorandum of Law

Generally, in support of their motion to dismiss, Defendants make two arguments: (1) the Amended Complaint fails to state a claim against Defendant Annucci, because its factual allegations do not plausibly suggest Defendant Annucci's personal involvement in the constitutional violations alleged through his knowledge about Plaintiff's circumstances or that Plaintiff's placement was improper; and (2) the Amended Complaint fails to state an ADA claim or Rehabilitation Act claim against Defendants Annucci, O'Gorman, and Bellnier, because (a) there is no individual liability under the ADA or the Rehabilitation Act, regardless of whether an individual is sued in his official or individual capacity, and (b) alternatively, the Amended Complaint fails to allege facts plausibly suggesting a causal connection between Plaintiff's disability and the adverse decision to continue his Ad Seg status, given that it plausibly suggests that he was placed in confinement due to his dangerous behavior, not due to his mental health condition.  (*See generally* Dkt. No. 48, Attach. 1 [Defs.' Mem. of Law].)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff makes two arguments: (1) the Amended Complaint states a claim against Defendant Annucci because (a) it plausibly suggests Defendant Annucci's personal involvement in the alleged constitutional violations through his knowledge of ongoing constitutional violations in Ad Seg (based on the nature of longstanding,

pervasive, well-documented, noted information of general issues surrounding confinement by prison officials, and the fact that he has been a defendant in numerous lawsuits regarding this same issue), (b) Plaintiff was denied basic human needs while in solitary confinement, and (c) Defendant Annucci should not be dismissed from this action because he is sued only in his official capacity and a defendant may be sued in his official capacity for injunctive relief; and (2) the Amended Complaint states valid claims under the ADA and Rehabilitation Act, because (a) injunctive relief is available under the ADA and Rehabilitation Act, as indicated by case law and the fact that this Court has allowed other claims like this to prevail, and (b) Plaintiff has alleged facts plausibly suggesting that he has been denied reasonable accommodation with respect to treatment of his disabilities while in prison.  (*See generally* Dkt. No. 50 [Pl.'s Opp'n Mem. of Law].)

### 3.    Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make two arguments: (1) the Amended Complaint does not state a claim against Defendant Annucci because Plaintiff fails to allege facts plausibly suggesting that Defendant Annucci had actual knowledge of Plaintiff's circumstances and his constitutional deprivations, and instead, relies on irrelevant case law to support his Eighth and Fourteenth Amendment claims; and (2) the ADA claim and Rehabilitation Act claim are deficient because it is well established that there is no individual liability under the ADA or the Rehabilitation Act, regardless of whether the individual is sued in his official or individual capacity.  (*See generally* Dkt. No. 55 [Defs.' Reply Mem. of Law].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing Motions to Dismiss for Failure to State Claim

It has long been understood that a dismissal for failure to state a claim upon which relief

can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp.2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp.2d at 212, n.17 (citing Supreme Court cases) (emphasis added).[12]

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp.2d at 212, n.18 (citing Supreme

---

[12]   *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

Court cases); *Rusyniak v. Gensini,* 629 F. Supp.2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases).  For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003).  For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard.  *Rusyniak,* 629 F. Supp.2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69.  Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim.  *Id*. at 1965-74.  The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965.  More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true.  *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

129 S.Ct. 1937, 1949 (2009).  "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense . . ..  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief."  *Iqbal*, 129 S.Ct. at 1950 [internal quotation marks and citations omitted].  However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement."  *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice."  *Iqbal*, 129 S.Ct. at 1949.  Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice.  *Iqbal*, 129 S.Ct. at 1949 (internal citations and alterations omitted).  Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated.  Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4)

any matter of which the court can take judicial notice for the factual background of the case.[13]

**B.      Standard Governing Claims Under 42 U.S.C. § 1983**

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against

any person who, acting under color of state law, deprives another person of a right, privilege or

immunity secured by the Constitution or the laws of the United States.  42 U.S.C. § 1983;

*Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999).  It is well established that state prisoners are

protected by Section 1983 and may bring claims based on their deprivation of rights while

subject to confinement.  *Cooper v. Pate*, 378 U.S. 546, 546 (1964).  In a case where a prisoner is

suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose:

---

[13]      *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a
pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, 10-CV-0573,
2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to
dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed.
R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the
complaint or answer, [2] documents incorporated by reference in the complaint (and provided by
the parties), [3] documents that, although not incorporated by reference, are "integral" to the
complaint, or [4] any matter of which the court can take judicial notice for the factual
background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)
(explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may
consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint. . . .  Where a document is not
incorporated by reference, the court may neverless consider it where the complaint relies heavily
upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . .
However, even if a document is 'integral' to the complaint, it must be clear on the record that no
dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that
there exist no material disputed issues of fact regarding the relevance of the document.")
[internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147,
152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as
an exhibit or any statements or documents incorporated in it by reference.") (internal quotation
marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72
(2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or
incorporate by reference a [document] upon which it solely relies and which is integral to the
complaint," the court may nevertheless take the document into consideration in deciding [a]
defendant's motion to dismiss, without converting the proceeding to one for summary
judgment.") (internal quotation marks and citation omitted).

first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include direct participation—the personal participation by a person who has knowledge of the facts that make their conduct illegal—and indirect participation—the ordering or helping of others to conduct themselves in an unlawful manner. *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This

means that "a defendant in a Section 1983 action may not be held liable for damages for

constitutional violations merely because [he or she] held a high position of authority."  *Black v.*

*Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133,

138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where

the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the

health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal

involvement could have been proven by showing any five factors:

> "(1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation through
> a report or appeal, failed to remedy the wrong, (3) the defendant created a
> policy or custom under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom, (4) the defendant was
> grossly negligent in supervising subordinates who committed the wrongful
> acts, or (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that unconstitutional
> acts were occurring."

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*.  *See*

*Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused

conflict with the Second Circuit about the continued vitality of the supervisory liability test, but

declining to rule on the issue because it did not apply to the facts of the case).[14]  It was unclear in

the Second Circuit, up until recently, how exactly the *Iqbal* decision would affect the *Colon*

---

[14]      In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for
confinement based on religion, race, and/or national origin, the Supreme Court held that
"[b]ecause vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each
Government-official defendant, through the official's own individual actions, has violated the
Constitution.  *Iqbal*, 556 U.S. at 676.

test.[15]

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 129 S. Ct. at 1937) ("*Tangreti*"). "'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 834). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Because *Tangreti* was decided in December 2020, courts in this District have interpreted it in the same way: that the new standard in *Tangreti* has abrogated, and completely replaced, the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that

---

[15]     In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the court implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013), the court expressed no view on the extent to which *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing supervisory liability, although there was some suggestion that *Iqbal* may have limited the *Colon* factors (so that only the first and third factors listed above could be used). *Rasheen v. Adner*, 356 F.Supp.3d 222, 233-34 (N.D.N.Y. 2019).

each Government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, No. 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook,* 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

### 1. Standard Governing Cruel-and-Unusual Punishment Claims Under the Eighth Amendment

Generally, the Eighth Amendment protects against cruel and unusual punishment.  U.S. Const. amend. VIII.  A person's confinement in state prison is a form of punishment that is subject to scrutiny under the Eighth Amendment.  *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981).  Prison officials are required to take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  In particular, the Second Circuit has found that "sentenced prisoners are entitled to 'adequate food, clothing, shelter, sanitation, medical care and personal safety.'"  *Franks v. Russo*, 18-CV-1282, 2018 WL 6674293, at *9 (N.D.N.Y Dec. 19, 2018) (Suddaby, C.J.) (quoting *Wolfish v. Levi*, 573 F.2d 118, 125 [2d Cir. 1978], *rev'd on other grounds sub nom*).  However, while prison officials have a duty to protect prisoners in some capacity, not every incident causing an inmate injury translates into a constitutional liability.  *Farmer*, 511 U.S. at 834.

A plaintiff asserting an Eighth Amendment claim based on the conditions of his confinement must satisfy a test comprised of an objective and subjective component. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir. 1996). Objectively, the inmate "must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.'"[16] *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 [2d Cir. 1985]); *see also Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) ("the inmate must show that the conditions [of incarceration] . . . pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness"). Next, subjectively, the inmate "must demonstrate that the defendants imposed those conditions with 'deliberate indifference.'" *Jolly*, 76 F.3d at 468 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 [1991]). "Deliberate indifference" can be satisfied when a prison official has knowledge that an inmate faces a substantial risk of harm to the inmate's health or safety, and still disregards that risk by failing to take reasonable measures to help. *Jolly*, 76 F.3d at 481*; see also Farmer*, 511 U.S. at 837.

In the context of an Eighth Amendment claim, to show that a defendant failed to prevent an inmate's harm, the plaintiff must allege two elements: (1) "conditions of confinement that objectively pose an unreasonable risk of serious to their current or future health," and (2) "that the defendant acted with 'deliberate indifference.'" *Tangreti*, 983 F.3d at 618-19 (quoting *Vega v. Semple*, 963 F.3d 259, 273 [2d Cir. 2020]). In the same context, a government official acts with deliberate difference when they "'know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

---

[16]     There is no clear test to determine what constitutes an "unquestioned" or "serious" deprivation of human needs. *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019). Generally, a court must look at whether the conditions would violate society's standards of decency and whether the conditions would or would not be among those society would typically tolerate. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"
*Vega*, 963 F.3d at 273 (quoting *Farmer*, 511 U.S. at 837).

In addition to satisfying both requirements of the Eighth Amendment analysis, a plaintiff
must show that each defendant, through their own actions, violated plaintiff's Eighth
Amendment rights and was personally aware of and disregarded an excessive risk to plaintiff's
health or safety. *Lee v. Cook*, 21-CV-0399, 2021 WL 3055403, at *4 (D. Conn. 2021). For
example, in *Tangreti*, an inmate-plaintiff sued prison officials (including one supervisory
official, whose role in the underlying alleged events and subsequent liability was of primary
issue) under Section 1983 for violating her Eighth Amendment rights. *See generally Tangreti*,
983 F.3d at 609. There, the Second Circuit held that even if the defendant had acted negligently,
she was nonetheless not liable because the defendant lacked the subjective awareness of the risk
faced by the plaintiff. *Id.* at 619.

### 2.    Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause protects an individual's procedural
and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020) (Hurd, J.).
Under the Due Process Clause, a prisoner "has the right not to be deprived of a protected liberty
interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). To
state a procedural due process claim, a plaintiff must establish two elements: "(1) that he
possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of
insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001). The amount of
process given to a plaintiff depends on three factors: (1) "the private interest that will be affected
by the official action;" (2) "the risk of erroneous deprivation of such interest through the
procedures used;" and (3) "the [g]overnment's interest, including the function involved and the

fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In addition, prison officials are required to periodically review whether an inmate, who is confined in Ad Seg, continues to pose a threat to the prison and therefore must stay in Ad Seg, or whether the inmate no longer poses a threat and can be released into the prison's general population. *Proctor v. LeClaire*, 846 F.3d 597, 601 (2d Cir. 2017). The reviews exist to ensure that the state's interest in confining the inmate in Ad Seg is still valid and that Ad Seg is not being used as a pretext to keep the inmate in a SHU indefinitely. *Proctor*, 846 F.3d at 609. To balance these competing interests, the Second Circuit has established three criteria that the periodic reviews must satisfy.[17] *Id.* at 610.

First, rather than simply go through the motions of evaluating while having a pre-ordained outcome in mind, "the reviewing prison officials must actually evaluate whether the inmate's Ad Seg confinement is justified." *Id.* at 610. "Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence [related to changes in the prison conditions and inmate behavior] as it becomes available." *Id.* at 611. That said, prison officials are not barred from giving significant weight to an inmate's past behavior or conduct. In other words, the decisionmaker "must take into account prison conditions and inmate behavior as they change over time," because "those changes may modify the calculus of whether the inmate presents a current threat to the safety of the facility." *Id.* Third, the officials must be approving an inmate's continued Ad Seg term for the actual purpose of maintaining the prison's institutional

---

[17] The Court notes that generally, when assessing whether a correctional facility violated an inmate's procedural due process rights in confining the inmate to Ad Seg, a court should focus only on analyzing whether the defendants' method for deciding that Ad Seg is sufficient and may not take into account the substance of the decision to confine the inmate. *Proctor*, 846 F.3d at 610.

safety and security (or another valid reason, not including punitive reasons).  *Id.* at 611.  It would

be pretextual and thus impermissible for officials to proffer that an inmate's release from Ad Seg

would risk the prison's safety and security, but, when in actuality, the continued Ad Seg stint

was serving "as a charade . . . to mask indefinite punishment for past transgressions."  *Id.*

Although these criteria highlight an inmate's due process rights to periodic reviews while

being confined in Ad Seg, the Supreme Court has explained that inmates in administrative

segregation are entitled to only minimal due process.  *Hewitt*, 459 U.S. at 476, *abrogated in part*

*on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  The mandated periodic reviews are

flexible, and the decisions in those reviews can be made based on "a wide range of

administrative considerations," including "observations of the inmate in Ad Seg, 'general

knowledge of the prison conditions,' misconduct charges, ongoing tensions in the prison, and

any ongoing investigations."  *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9).

Prison officials have the final say when it comes to Ad Seg decisions, and their decisions can

"turn[ ] largely on purely subjective evaluations and on predictions of future behavior."  *Hewitt*,

459 U.S. at 474 (internal quotation marks and citation omitted).

Lastly, in addition to the above-described rules regarding periodic reviews, there are

rules (governed by agency policy) regarding how often prison officials must conduct periodic Ad

Seg reviews.  However, because individual states govern their respective agency policies through

state procedural statutes, violations of state procedural statutes that are adjudicated with due

process defects are generally not enough to establish constitutional claims.[18]  *See Soto v. Walker*,

---

[18]     For example, in *H'Shaka v. O'Gorman*, 444 F. Supp.3d 355, 373 (N.D.N.Y. 2020), this
Court found no procedural due process violation where prison officials conducted periodic Ad
Seg reviews approximately every two months, as opposed to every sixty days as required by
agency policy.  *See also Sanders v. Gifford*, 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y.
Nov. 4, 2014) ("[E]ven assuming that Defendant Graham deviated from state procedures or
DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to
liability under § 1983."); *Ahlers v. Nowicki*, 12-CV-0539, 2014 WL 1056935, at *4 (N.D.N.Y.

44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone

without a due process violation, "would not be enough generally to establish a constitutional

claim").

      **C.**      **Standard Governing Title II Claims Under the ADA and Section 504 Claims Under the Rehabilitation Act**

"Title II of the ADA requires that 'no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity.'" *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting 42 U.S.C.

§ 12132).  In 1990, Congress enacted the ADA, and like the Rehabilitation Act, one of the main

goals of the ADA is to protect individuals with disabilities.  42 U.S.C. §§ 12101 *et. seq*.  Section

504 of the Rehabilitation Act requires that "[n]o otherwise individual with a disability . . . shall,

solely by reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance . . . ."  *Wright*, 831 F.3d at 72 (citing 29 U.S.C. § 794[a]).

The standards set forth in both Title II of the ADA and Section 504 of the Rehabilitation

Act "are generally the same . . . ," and thus, the Second Circuit "'treat[s] claims under the two

statutes identically.'"  *Wright*, 831 F.3d at 72 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261,

272 [2d Cir. 2003]); *see also Graham v. Watertown City Sch. Dist.*, 10-CV-0756, 2011 WL

1344149, at *9 (N.D.N.Y. Apr. 8, 2011) ("The ADA and Rehabilitation Act causes of action for

failure to accommodate will be considered together").  Relevant here, both statutes apply to

protect prisoners incarcerated in state prisons.  *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S.

---

Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are
incognizable under § 1983; only rights secured by the Constitution and federal law are
actionable under § 1983.").

206, 213 (1998) (holding that Title II of the ADA applies to prisoners incarcerated in state prisons); *Keitt v. N.Y. State Dep't of Corrs.*, 11-CV-0855, 2015 WL 2383687, at *20 (W.D.N.Y. May 19, 2015) (holding that Section 504 of the Rehabilitation Act applies to prisoners incarcerated in state prisons).

To establish a violation of Title II of the ADA, a plaintiff must establish three elements: (1) the plaintiff is a qualified individual with a disability;[19] (2) the defendants are subject to the ADA; and (3) the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, based on the plaintiff's disability.[20] *Henrietta D.*, 331 F.3d at 272. To establish a violation of the Rehabilitation Act, the same prima facie elements apply, with the exception that, the plaintiff must also show that the defendants receive federal funding. *Id.*

Generally, under the ADA and Rehabilitation Act, a state official may not be sued in their individual capacity. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").

---

[19] A "qualified individual" is one "with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting 42 U.S.C. § 12131[2]). More specifically, the ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph [3])." 42 U.S.C. § 12102(1).

[20] To establish the third element, the qualified individual can base their claim of discrimination on any of three available theories: (1) intentional discrimination (in other words, disparate treatment); (2) disparate impact; or (3) failure to make reasonable accommodation. *Fulton*, 591 F.3d at 43; *see also Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

In the Second Circuit, it is unsettled whether an individual defendant can be sued in their official capacity to defend against ADA or Rehabilitation Act claims.  *See Monroe v. Gerbing*, 16-CV-2818, 2017 WL 6614625, at *15 (S.D.N.Y. Dec. 27, 2017) (collecting cases illustrating the inconsistent holdings as to whether individuals, in their official capacity, can be sued under the ADA or Rehabilitation Act).  On one hand, generally, some district courts within the Second Circuit have held that the ADA and Rehabilitation Act do not provide for liability against defendants in their official capacities.  *Monroe*, 2017 WL 6614625, at *15.  In limited instances, the Second Circuit has allowed "an ADA claim for *damages* against a state (or state agency or official)" to proceed but only "if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability."  *Id*; *Garcia*, 280 F.3d at 112.  On the other hand, some district courts within the Second Circuit have allowed for a defendant to be sued in their official capacity under the ADA and Rehabilitation Act for injunctive relief, but not for damages.  *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (permitting a claim against individual defendants to be asserted only if the plaintiff was seeking injunctive relief).  Under the ADA, an individual can be sued for injunctive relief in their official capacity because the individual is effectively a "public entity" where "the government is the real party in interest in an official capacity suit."  *Henrietta D.*, 331 F.3d at 288.

## III.   ANALYSIS

### A.   Whether the Amended Complaint Alleges Facts Plausibly Suggesting the Personal Involvement of Defendant Annucci

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law.  (Dkt. No. 48, Attach. 1, at 5-6 [Defs.' Mem. of Law]; Dkt. No. 55, at 3-6 [Defs' Reply Mem. of Law].)  To those reasons, the Court adds the following analysis.

"An individual cannot be held liable for [monetary] damages under [Section] 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged [constitutional rights] deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 [2d Cir. 1996]). Therefore, to survive this aspect of Defendants' motion to dismiss, Plaintiff must establish Defendant Annucci's personal involvement in the alleged conduct resulting in Plaintiff's constitutional rights deprivation.

### 1.    Eighth Amendment Claims

As noted above in Part II.C. of this Decision and Order, in the context of an Eighth Amendment claim, to establish a supervisor-defendant's personal involvement, Plaintiff must establish that Defendant Annucci violated the Eighth Amendment by Annucci's own conduct, not by reason of Defendant Annucci's supervision of others who committed the violation. Plaintiff must show that Defendant Annucci himself "acted with 'deliberate indifference'"—meaning that Defendant Annucci personally knew of and disregarded an excessive risk to Plaintiff's health or safety. *Vega*, 963 F.3d at 273 (quoting *Farmer*, 511 U.S. at 834). Plaintiff cannot rely on a separate test of liability specific to supervisors. *Tangreti*, 983 F.3d at 619; s*ee also Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("These defendants are thus liable only if they *personally displayed* deliberate indifference to the risk that [the inmate] would be assaulted [or harmed.]")

Here, Plaintiff does not allege facts plausibly suggesting that Defendant Annucci created or knew about the conditions experienced by Plaintiff, or that Defendant Annucci knew about Plaintiff's complaints regarding those conditions. Plaintiff also fails to allege facts plausibly suggesting that Defendant Annucci knew how long Plaintiff personally had been confined in the

SHU (that could lead Defendant Annucci to plausibly believe that Plaintiff was experiencing a grossly disproportionate sentence).

Instead, Plaintiff alleges that, because Defendant Annucci is currently the Acting Commissioner of DOCCS, Defendant Annucci is responsible for overall management and operation of DOCCS, has final policy-making and supervisory authority within DOCCS, and has been responsible for authorizing and maintaining general policies and customs in question by Plaintiff. (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].) "'[L]inkage in the prison chain of command' is insufficient" to implicate a state supervisory official in a Section 1983 claim. *Hernandez v. Keane*, 341 F.3d 137, 144-45 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 [2d Cir. 1985]); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a [Section] 1983 claim." [internal quotation marks omitted]). These alleged facts merely provide background regarding Defendant Annucci's job duties, but in no way plausibly suggest that Defendant Annucci had subjective knowledge of Plaintiff's living conditions. As a result, liberally construed, these facts plausibly suggest only that Defendant Annucci is a high-ranking officer within DOCCS with high-level authority to control general policies.[21]

---

[21]     *See, e.g.*, *Lee v. Cook*, 21-CV-0399, 2021 WL 3055403, at *4 (D. Conn. July 20, 2021) (dismissing an Eighth Amendment claim against a prison official, where plaintiff alleged prison official's response to the COVID-19 pandemic was inadequate, explaining that, while the inmate identified generally deficient policies instituted by the prison official in response to the pandemic, the inmate did not allege that the officer had any subjective knowledge that the policies posed a risk of harm to inmate specifically); *Gunn v. Annucci*, 20-CV-2004, 2021 WL 1699949, at *7 (S.D.N.Y. Apr. 29, 2021) (dismissing an Eighth Amendment claim against Defendant Annucci where the plaintiff failed to allege facts plausibly suggesting Defendant Annucci's personal involvement contributed to a substandard prison atmosphere); *Russell v. Stanford*, 21-CV-0296, 2021 WL 1565147, at *5 (N.D.N.Y. Apr. 21, 2021) (Suddaby, C.J.) (dismissing claims against Defendant Annucci for lack of personal involvement in the alleged unconstitutional conduct); *Murphy v. Spaulding*, 20-CV-9013, 2020 WL 7248855, at *3 (S.D.N.Y. Dec. 7, 2020) (explaining that an officer who had created an atmosphere that allowed

Plaintiff contends that, based on earlier litigation brought by other inmates claiming similar Eighth Amendment violations and a settlement agreement entered into by DOCCS in 2016,[22] Defendant Annucci developed an awareness and knowledge of the general risk that inmates face in Ad Seg, and that, given his awareness and position of power, Defendant Annucci failed to remedy the unconstitutional policies and practices that enabled Plaintiff's Ad Seg term of confinement.  (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].)

Courts within this Circuit have considered whether "knowledge of prior lawsuits may apprise defendants of the existence of a constitutional deficient conditions or policies, particularly when accompanied by sufficient details of the lawsuit and their relation to the current allegations." *Constant v. Prack*, 16-CV-3985, 2019 WL 3287818, at *8 (S.D.N.Y. July 19, 2019) (collecting cases).  Although courts within this Circuit have recognized that prior lawsuits are relevant to showing a custom or practice, they usually require more lawsuits than the number alleged here.  *See Edwards v. City of New York*, 14-CV-10058, 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (noting that the complaint included citations to eighteen lawsuits filed between 1999 and 2011); *McCants v. City of Newburgh*, 14-CV-0556, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (denying motion to dismiss where plaintiff cited seventeen similar lawsuits).

---

constitutional violations to occur was insufficient to allege that officer's personal involvement); *Haywood v. Annucci*, 18-CV-10913, 2020 WL 5751530, at *5 (S.D.N.Y. Sept. 25, 2020) (holding that the plaintiff failed to offer factual allegations that Defendant Annucci was present for, or knew of, the alleged constitutional violation).

[22]     The Court notes that, in *Peoples v. Annucci*, 180 F. Supp.3d 294, 297-98 (S.D.N.Y. 2016), as part of a settlement agreement, DOCCS agreed to reevaluate its policies that would lead to a reduction in the number of inmates confined in SHU and decrease the length of time that an inmate could spend in SHU ("*Peoples* Settlement").  However, Plaintiff began his Ad Seg confinement on or about April 17, 2006—approximately ten years prior to the effective date of the *Peoples* Settlement.  (Dkt. No. 42, at 10 [Pl.'s Am. Compl.].)

In addition, under certain conditions, even the presence of a fairly significant number of lawsuits has been found to be insufficient to plausibly suggest personal involvement. *See, e.g.*, *Calderon v. City of New York*, 138 F. Supp.3d 593, 612-13 (S.D.N.Y. 2015) (finding that generic allegations of sixteen prior lawsuits were insufficient to establish a widespread custom or practice, or to plausibly suggest a failure to train or supervise where plaintiff failed to include any allegations about the municipality's response to those cited lawsuits); *Tieman v. City of Newburgh*, 13-CV-4178, 2015 WL 1379652, at *16-17 (S.D.N.Y. Mar. 26, 2015) (finding that plaintiff's citation to nine prior lawsuits was insufficient to establish a custom or policy); *Guillory v. Cuomo*, No. 14-CV-0971, 2014 WL 11173632, at *4 (N.D.N.Y. Dec. 2, 2014) (dismissing claims where plaintiffs cited to four prior lawsuits but failed to allege how the defendants had involvement or knowledge of the incidents included in those lawsuits).

The fact that Defendant Annucci may have been aware of general issues regarding prison conditions and the general effect that those issues may have on inmates does not plausibly suggest that Defendant Annucci had sufficient knowledge of the specific circumstances and details of Plaintiff's Ad Seg confinement. As a result, the Court finds that Plaintiff's citation to six prior lawsuits against DOCCS employees, some of which include Defendant Annucci, does not suffice to plausibly suggest either the existence of a DOCCS custom or policy or the fact that Defendant Annucci had personal knowledge of the specific circumstances regarding Plaintiff's Ad Seg confinement and disregarded an excessive risk to Plaintiff's health or safety. Additionally, the remainder of Plaintiff's allegations (e.g., that notwithstanding Defendant Annucci's awareness of the unconstitutional risk of harm to inmates by confining them in Ad Seg,[23] and that notwithstanding his awareness of the risk posed to inmates in Ad Seg, Defendant

---

[23]   The Court notes that, even if Plaintiff had provided factual allegations plausibly suggesting Defendant Annucci's awareness of lengthy stints in Ad Seg, the Second Circuit and other courts within this Circuit have repeatedly upheld the typical conditions of SHU or Ad Seg

Annucci failed to modify policies and procedures that would ensure [1] Plaintiff not be placed in isolation for extended periods of time thereby preventing the exacerbation of his mental health symptoms, and [2] Plaintiff be offered adequate out-of-cell time, social interaction, and environmental stimulation) are too conclusory and unsupported by sufficient factual allegations to plausibly suggest personal involvement by Defendant Annucci. *See Rodriguez v. City of New York*, 649 F. Supp.2d 301, 308 (S.D.N.Y. 2009) (dismissing supervisory liability claim where the plaintiff had "not provided a shred of particularization of the conclusory allegations that DA Morgenthau 'repeatedly failed to make any meaningful investigation into charges of constitutional violations by its staff").

Plaintiff appears to imply that Defendant Annucci is ultimately liable based on his personal involvement in Plaintiff's Eighth Amendment violations by way of the factors outlined in *Colon*: specifically, the second factor—when an official, after being informed of the violation through report or appeal, failed to remedy their wrong—and the third factor—when the official created a policy or custom under which unconstitutional practices occurred or allowed the continuance of a policy or custom. *Colon*, 58 F.3d at 873. However, *Tangreti* provided a new

---

to be constitutional. *See Smith v. Annucci*, 18-CV-6261, 2019 WL 539935, at *6 (W.D.N.Y. Feb 11, 2019) ("Courts in this Circuit have held as a general rule, administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of the penalty that criminal offenders pay for their offenses against society."); *Zimmerman v. Todd*, 15-CV-1437, 2018 WL 4691254, at *8 (N.D.N.Y. Aug. 30, 2018) (Peebles, M.J.) ("Generally speaking, confinement in a DOCCS facility's SHU under ordinary conditions does not rule afoul of the Eighth Amendment's prohibition of cruel and unusual punishment."), *adopted by* 2018 WL 4689105 (N.D.N.Y. Sept. 28, 2018) (Kahn, J.); *Booker v. Maly*, 12-CV-0246, 2014 WL 1289579, at *16-17 (N.D.N.Y. Mar. 31, 2014) (report-recommendation by Baxter, M.J., *adopted by* Mordue, J.) ("Restrictive SHU conditions on their own do not per se rise to the level of cruel and unusual punishment.").

standard for establishing personal involvement of supervisory officials like Defendant Annucci, and therefore the *Colon* factors are no longer applicable to the Court's analysis. [24]

Lastly, Plaintiff argues that the subjective component of the Eighth Amendment analysis is better addressed at the summary judgment phase.  (Dkt. No. 50 at 17-18 [Pl.'s Opp'n Mem. of Law].)  The Court will not address this argument because Plaintiff has failed to allege facts plausibly suggesting Defendant Annucci's personal involvement in the alleged conduct giving rise to Plaintiff's Eighth Amendment claims.[25]

For all of the above reasons, the Court finds that Plaintiff is precluded from seeking relief in the form of monetary damages stemming from his Eighth Amendment claim against Defendant Annucci.

### 2.      Fourteenth Amendment Claim

As noted above in Part II.D. of this Decision and Order, in the context of a Fourteenth Amendment procedural due process claim, to allege a supervisor-defendant's personal involvement, Plaintiff must allege that Defendant Annucci violated the Fourteenth Amendment by Annucci's own conduct, and not by reason of Defendant Annucci's supervision of others who committed the violation.  Specifically, Plaintiff must show, through factual allegations, three things: (1) that Defendant Annucci actually evaluated whether Plaintiff's confinement in Ad Seg was justified; (2) that Defendant Annucci evaluated whether the justification for Ad Seg existed at the time of the periodic review or will exist in the future, and considered new relevant evidence related to changes in the prison conditions and inmate behavior as it became available;

---

[24]        To demonstrate Defendant Annucci's personal involvement in the alleged Eighth Amendment violation of Plaintiff's rights while in Ad Seg, Plaintiff cites other cases in this District that pre-date *Tangreti*.  (Dkt. No. 50, at 16-17 [Pl.'s Opp'n Memo. of Law].)   In doing so, Plaintiff fails to acknowledge *Tangreti* which (again) established a new personal involvement standard for supervisory officials.

[25]        Had Plaintiff established Defendant Annucci's personal involvement, the Court agrees with Defendants' reading of *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) and *Guilbert v. Sennet*, 235 F. App'x 823 (2d Cir. 2007), for the reasons set forth in Defendants' reply memorandum of law. (Dkt. No. 55, at 4 [Defs.' Reply Mem. of Law].)

and (3) that Defendant Annucci approved Plaintiff's continued Ad Seg term for the actual

purpose of maintaining the prison's institutional safety and security, not including punitive

reasons.  *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7,

2021); *Proctor*, 846 F.3d at 611.  Here, Plaintiff fails to allege facts plausibly suggesting

Defendant Annucci satisfied any of these three things.

Generally, in his Amended Complaint, Plaintiff alleges that Defendants violated his

Fourteenth Amendment right to procedural due process based on a lack of meaningful periodic

Ad Seg review.  This, as Plaintiff contends, resulted in the denial of a protected liberty interest in

avoiding long-term solitary confinement.  (Dkt. No. 42, at 29 [Pl.'s Am. Compl.].)  Specifically,

Plaintiff alleges facts plausibly as to how Defendants John or Jane Does 1-15, O'Gorman,

Bellnier, Reardon, Thomas, Colvin, and Chappius have violated Plaintiff's right to meaningful

review.

However, Plaintiff fails to allege specific factual instances as to Defendant Annucci's

personal involvement in the periodic Ad Seg review process.  (*Id*. at 29-30.)  Instead of

providing factual allegations showing Defendant Annucci's role in depriving Plaintiff of his

procedural due process rights, Plaintiff merely states that Defendant Annucci "deprived

[Plaintiff] of a protected liberty interest in avoiding long-term solitary confinement," and that

therefore Defendant Annucci's conduct violated Plaintiff's procedural due process rights.  (*Id*. at

30.)  However, there is no mention of facts that demonstrate how Defendant Annucci's own

conduct actually caused Plaintiff's procedural due process deprivation.  (*See generally* Dkt. No.

42 [Pl.'s Am. Compl.].)

Supervisory prison officials who merely review and affirm outcomes of prisoner

disciplinary hearings are not personally involved in the disciplinary hearing itself.  *See, e.g.*,

*Brown v. Annucci*, 19-CV-9048, 2021 WL 860189, at *9 (S.D.N.Y. Mar. 8, 2021) (dismissing a procedural due process claim against defendant whose conduct involved only denying the reconsideration of an inmate's disciplinary hearing); *Smart v. Annucci*, 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("[A]ffirming the outcome of a prison hearing was not sufficient to establish personal involvement"). Here, Plaintiff does even allege facts plausibly suggesting that Defendant Annucci's involvement rose to that level. In other words, Plaintiff's Amended Complaint does not sufficiently allege how Defendant Annucci was personally involved in maintaining Plaintiff's Ad Seg confinement.

For the above reasons, the Court finds that Plaintiff is precluded from seeking relief in the form of monetary damages stemming from his Fourteenth Amendment claim against Defendant Annucci.

### B.   Whether Plaintiff's Claims Against Defendant Annucci for Injunctive Relief Survive Defendant Annucci's Lack of Personal Involvement

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 50 [Pl.'s Opp'n Mem. of Law].) To those reasons, the Court adds the following analysis.

As Plaintiff correctly argues, both his Eighth Amendment claims against Defendant Annucci and his Fourteenth Amendment claim against Defendant Annucci survive Defendants' motion to dismiss to the extent that those claims request injunctive relief, because personal involvement is a prerequisite only for recovering monetary damages against government officials sued in their official capacity. *See, e.g.*, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) (explaining that a defendant's personal involvement in an alleged constitutional deprivation brought under Section 1983 is a prerequisite to only an award of monetary damages); *Marinaccio v. Boardman,* 02-CV-0831, 2005 WL 928631, at *9 (N.D.N.Y. Apr. 19,

2005) (McCurn, S.J.) (reiterating that courts within the Second Circuit consistently hold that a defendant's lack of personal involvement does not bar claims brought under Section 1983 that seek injunctive relief); *N.Y. Youth Club v. Town of Smithtown*, 867 F. Supp.2d 328, 339 (E.D.N.Y. 2012) ("[P]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under [Section] 1983.").

Although the Court finds (based on the current record) that Defendant Annucci was not personally involved in the alleged conduct giving rise to Plaintiff's Eighth Amendment claims and Fourteenth Amendment claim, Plaintiff may seek injunctive relief as to those claims against him.

## C.     Whether Plaintiff's ADA Claim and Rehabilitation Act Claim Can Be Brought Against Defendants Annucci, Bellnier, and O'Gorman in Their Official Capacities

As stated above in Part I.B. of this Decision and Order, generally, in support of their motion to dismiss of the ADA claim and Rehabilitation Act claim, the DOCCS Commissioner Defendants make two alternative arguments: (1) as a threshold matter, the ADA claim and Rehabilitation Act claim should be dismissed because those two statutes do not allow an individual to be sued, regardless of whether that individual were sued in their official or individual capacity; and (2) in the alternative, the ADA claim and Rehabilitation Act claim should be dismissed because they fail on the merits as a matter of law.  (Dkt. No. 48, Attach. 1, at 6-9 [Defs.' Mem. of Law].)  After carefully considering the matter, the Court agrees with the DOCCS' Commissioner Defendants' alternative argument that Plaintiff's ADA claim and Rehabilitation claim both fail on the merits for the reasons offered by Defendants.  Therefore, the Court need not, and will not, address the DOCCS Commissioner Defendants' threshold argument regarding individual liability under the ADA and the Rehabilitation Act.  To the

reasons offered by Defendants, the Court adds the following analysis.

As discussed above in Part II.E. of this Decision and Order, to establish a violation of Title II of the ADA and Rehabilitation Act, a plaintiff must establish three elements: (1) the plaintiff is a qualified individual with a disability, (2) the defendant is subject to the ADA or Rehabilitation Act, and (3) based on the plaintiff's disability, the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). To establish a violation of Section 504 of the Rehabilitation Act, in addition to the three elements to establish an ADA claim, a plaintiff must also establish that the defendant receives federal funding.[26]

Although Plaintiff has alleged facts plausibly suggesting the first two elements,[27] the Court finds that he has failed to allege the third element of his ADA claim and Rehabilitation Act claim—that Plaintiff was denied the opportunity to participate in or benefit from the DOCCS Commissioner Defendants' services, programs, or activities, or was otherwise discriminated against by the DOCCS Commissioner Defendants, based on Plaintiff's disabilities. To establish the third element of Plaintiff's ADA claim and Rehabilitation Act claim, Plaintiff "can base a discrimination claim on any of [the] 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Tsombanidis v.*

---

[26]    The parties do not dispute that Plaintiff sufficiently alleged that DOCCS receives federal funding. (Dkt. No. 50, at 22 [Pl.'s Opp'n Mem. of Law].)

[27]    The Court notes that the DOCCS Commissioner Defendants concede that Plaintiff has alleged facts plausibly suggesting the presence of the first two elements, i.e., first, Plaintiff is a qualified individual with a disability, and second, DOCCS is subject to the ADA. (Dkt. No. 50 at 22 [Pl.'s Opp'n Mem. of Law].)

*West Haven Fire Dep't*, 352 F.3d 565, 573 [2d Cir. 2003]).  In his Amended Complaint, Plaintiff alleges that he is "qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody," and "[b]y virtue of his confinement in Ad Seg, [Plaintiff] is precluded from participating in services, programs and activities and from receiving any benefits provided to incarcerated people in DOCCS custody," such as "group recreation, meals, education, and prayer . . . ."  (Dkt. No. 42, at 31 [Pl.'s Am. Compl.]; Dkt. No. 50, at 23 [Pl.'s Opp'n Mem. of Law].)  As a result, Plaintiff alleges, "DOCCS Commissioner Defendants violate the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination against [Plaintiff] on the basis of his disability."  (*Id.*)

At the time of filing his Amended Complaint, Plaintiff was diagnosed with, among other things, antisocial personality disorder, bipolar disorder, and schizophrenia.  (Dkt. No. 42, at 31 [Pl.'s Am. Compl.].)  Plaintiff's ADA claim and Rehabilitation Act claim are based on the DOCCS Commissioner Defendants' alleged failure to make a reasonable accommodation.  (Dkt. No. 50, at 23-26 [Pl.'s Opp'n Mem. of Law].)  Specifically, Plaintiff argues that the DOCCS Commissioner Defendants "failed to provide reasonable accommodations to alleviate the mental anguish felt . . . in solitary confinement and [to] minimize the impact to his mental health."  (*Id.* at 24.)  The Court agrees with Plaintiff's position that the "reasonableness of an [] accommodation is a fact-specific question that often must be resolved by a factfinder" at trial. (*Id.* at 23 [quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 95 (2d Cir. 2015)].)  However, the third element of Plaintiff's ADA claim and Rehabilitation claim (being denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or being otherwise discriminated against by defendants, based on the plaintiff's disability) must be

34

shown by two components: (1) a causal connection between the disability and the adverse

decision; and (2) the fact that the plaintiff's disability was the sole cause of that adverse decision.

*Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994) (citing *Teahan v. Metro-North Commuter R.R.*

*Co.*, 951 F.2d 511, 517 [2d Cir. 1991]).

      "Courts 'routinely dismiss ADA suits [brought] by disabled inmates that . . . do not

allege that the inmate was treated differently because of his or her disability.'"  *Benyi v. New*

*York*, 20-CV-1463, 2021 WL 1406649, at *13 (N.D.N.Y. Mar. 23, 2021) (Lovric, M.J.) (quoting

*Elbert v. N.Y.S. Dep't of Corr. Servs.*, 751 F. Supp.2d 590, 595 [S.D.N.Y. 2010].).  Here,

Plaintiff has failed to allege facts plausibly suggesting a causal connection between his

disabilities and his alleged denial of access to DOCCS' services, programs, or activities.  In fact,

the Court finds Plaintiff's argument to be misplaced.  Granted, Plaintiff has alleged facts

plausibly suggesting that his Ad Seg confinement resulted in reduced access and participation.

However, a defendant does not violate the ADA by merely "deny[ing] an inmate's request for

reasonable accommodations because of a reason other than his disability."  *Espinal v. N.Y. State*

*Dep't of Corr. Servs.*, 06-CV-0596, 2009 WL 799951, at *6 (N.D.N.Y. Mar. 24, 2009).  Here,

Plaintiff's Ad Seg confinement is a result of his prior behavior while in DOCCS custody, not his

disabilities.[28]  Specifically, Plaintiff's Amended Complaint lacks factual allegations plausibly

suggesting that he was unable to access services, programs, or activities due to his disabilities or

how his disabilities prevented him from accessing or participating in those services, programs, or

activities.  (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].)

---

[28]     The Court notes that Plaintiff's Ad Seg confinement was ordered based on the following behavior: "while appearing in Brooklyn Supreme Court, [Plaintiff] . . . leap[ed] across the defense table and tr[ied] to grab a Court Officer's handgun.  [Plaintiff] committed this offense while armed with a plastic homemade knife.  [Plaintiff] committed this act in an attempt to escape . . . ."  (Dkt. No. 42, at 10-11 [Pl.'s Am. Compl.].)

Therefore, the Court finds that Plaintiff's alleged denial of access to DOCCS' services, programs, or activities was not the result of his disabilities, and his ADA and Rehabilitation claims therefore fail as a matter of law.[29]  *See, e.g.*, *Schnauder v. Gibens*, 649 F. App'x 8, 11 (2d Cir. 2017) (dismissing an ADA claim after not finding the plaintiff's disability to be the reason for a denial of medical services); *Blandon v. Aitchison*, 17-CV-0065, 2019 WL 1206370, at *11 (S.D.N.Y. Mar. 14, 2019) (dismissing an ADA claim after not finding the plaintiff's disability to be the reason for his mistreatment); *Alster v. Goord*, 745 F. Supp.2d 317, 340 (S.D.N.Y. 2010) (same).

For these reasons, the Court grants Defendants' motion to dismiss with regard to Plaintiff's ADA claim and Rehabilitation Act claim against Defendants Annucci, O'Gorman, and Bellnier.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss portions of Plaintiff's Amended Complaint pursuant to Fed R. Civ. P. 12(b)(6) (Dkt. No. 48) is <u>**GRANTED**</u> **in part** and <u>**DENIED**</u> **in part** in the following respects:

> (1)     Plaintiff's claims against Defendant Annucci under the Eighth and Fourteenth Amendments for *money damages* are <u>**DISMISSED**</u>;
>
> (2)     Plaintiff's claims against Defendant Annucci under the Eighth and Fourteenth Amendments for *injunctive relief* <u>**SURVIVE**</u> Defendants' motion to dismiss; and
>
> (3)     Plaintiff's claims against Defendants Annucci, O'Gorman and Bellnier

---

[29]     The Court notes that Plaintiff has alleged facts plausibly suggesting that his disabilities resulted from his Ad Seg confinement.  (Dkt. No. 42, at 19-21 [Pl.'s Am. Compl.].)

under Title II of the ADA and Section 504 of the Rehabilitation Act are

**<u>DISMISSED</u>**.

Date:   September 27, 2021
        Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge