UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TROY HENDRIX,

                                        Plaintiff,

v.                                                                    9:20-CV-0743
                                                                      (GTS/TWD)
ANTHONY J. ANNUCCI, Acting Commissioner,
Department of Corrections and Community
Supervision; JAMES O'GORMAN, Deputy
Commissioner for Correctional Facilities; JOSEPH
BELLNIER, former DOCCS Deputy Commissioner
for Correctional Facilities; PATRICK REARDON,
Superintendent of Marcy Correctional Facility;
JUSTIN THOMAS, former Superintendent of Marcy
Correctional Facility; JOHN COLVIN, former
Superintendent of Five Points Correctional Facility;
PAUL CHAPPIUS, former Superintendent of Elmira
Correctional Facility; JOHN or JANE DOES 1-5,
members of the DOCCS SHMC at Elmira
Correctional Facility; JOHN or JANE DOES
6-10, members of the DOCCS SHMC at Marcy
Correctional Facility; JOHN or JANE DOES 11-15,
members of the DOCCS SHMC at Five Points;

                                        Defendants.

_____

APPEARANCES:                                          OF COUNSEL:

SIDLEY AUSTIN LLP                                     ELLEN M. DUNN, ESQ.
    Counsel for Plaintiff                             CASSANDRA LIU, ESQ.
787 Seventh Ave.                                      ANDREW A. KUNSAK, ESQ.
New York, NY 10019                                    LESLIE KUHN-THAYER, ESQ.

HON. LETITIA A. JAMES                                 LAUREN ROSE EVERSLEY, ESQ.
Attorney General for the State of New York            MATTHEW GALLAGHER, ESQ.
    Counsel for Defendants
The Capitol
Albany, NY 12224

1

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this prisoner civil rights action filed by Troy Hendrix ("Plaintiff") against Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") Anthony J. Annucci, DOCCS Deputy Commissioner for Correctional Facilities James O'Gorman, former DOCCS Deputy Commissioner for Correctional Facilities Joseph Bellnier, Superintendent of Marcy Correctional Facility ("C.F.") Patrick Reardon, former Superintendent of Marcy C.F. Justin Thomas, former Superintendent of Five Points Correctional Facility John Colvin, former Superintendent of Elmira Correctional Facility, Paul Chappius, and John or Jane Does 1-15 (collectively "Defendants"), is Defendants' motion for summary judgment.   (Dkt. No. 108.)   Following oral argument on Defendants' motion, the Court reserved decision and indicated a written decision would be forthcoming.   (Text Minute Entry dated March 19, 2024.)   This is that written decision.   For the reasons set forth below, Defendants' motion is granted in its entirety.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Following the Court's issuance of its Decision and Order of September 27, 2021, the following three claims remain in this action (each claim being asserted against Defendant Annucci for injunctive relief only, and asserted against all other Defendants for both money damages and injunctive relief): (1) Plaintiff's claim for inadequate conditions of confinement under the Eighth Amendment; (2) Plaintiff's claim for grossly disproportionate sentences to solitary confinement that serve no legitimate penological purpose under the Eighth Amendment;

and (3) Plaintiff's claim for a lack of timely and meaningful periodic reviews in violation of the Fourteenth Amendment's Due Process Clause. (*Compare* Dkt. No. 42, at ¶¶ 99-134 [Plf.'s Am. Compl.] *with* Dkt. No. 58, at 36-37 [Decision and Order of Sept. 27, 2021].)

### B. Parties' Arguments on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert five arguments. (Dkt. No. 108, Attach. 1.) First, Defendants argue, Plaintiff's claims against Defendant Annucci must be dismissed, because (a) those claims are asserted against Annucci only for injunctive relief, and (b) there is no injunctive relief left for Annucci to provide (given that, at the time of the motion's filing, Plaintiff has been released from both Ad Seg and the Residential Mental Health Unit, and Annucci has no control over implementing mental health treatment). (*Id*. at 11-12.)[1]

Second, Defendants argue, Plaintiff has failed to adduce admissible record evidence from which a rational jury could find that the four Superintendent Defendants (i.e., Chappius, Colvin, Reardon and Thomas) were personally involved in the constitutional violations claimed for three reasons: (a) those Defendants had no authority over the decision to retain or release Plaintiff (or any other Ad Seg individual assessed under Central Office review) from confinement in Ad Seg, because (despite their limited review of the Ad Seg review documentation at the facility level), those Defendants did not approve or sign-off on their facility-specific review boards' decisions to keep Plaintiff confined; (b) indeed, the fact that Defendant Chappius spoke to Defendant O'Gorman about Plaintiff's release from Ad Seg on at least two occasions, and that Plaintiff was not released, demonstrates Chappius' (and the other three superintendent Defendants') lack of

---

[1]     Page citations in this Decision and Order refer to the screen numbers on the Court's Case Management / Electronic Case Filing ("CM/ECF") System, not to the page numbers stated on the documents contained therein.

personal involvement in the Ad Seg process; and (c) there is no evidence in the record before the Court that the four Superintendent Defendants even knew of (much less disregarded) Plaintiff's complained-of conditions of confinement (with three of those four Defendants not recalling ever having spoken to Plaintiff while he was confined at their facility).  (*Id*. at 12-17.)

Third, Defendants argue, each of Plaintiff's two Eighth Amendment claims (particularly against Defendants Bellnier and O'Gorman) must be dismissed, because Plaintiff has failed to adduce admissible record evidence from which a rational jury could find that Plaintiff has satisfied either (a) the governing standard's objective prong (requiring that the conditions of confinement result in unquestioned and serious deprivations of basic human needs such that the conditions pose an unreasonable risk of serious damage to one's health) or (b) the governing standard's subjective prong (requiring that the defendants imposed the conditions with deliberate indifference, meaning that the defendants knew of, and disregarded, an excessive risk to the plaintiff's health or safety).  (*Id*. at 17-23.)   More specifically, with regard to the objective prong of both claims, Defendants argue that the conditions of Plaintiff's Ad Seg confinement that are indisputably established by the record do not amount to anything more than general Special Housing Unit ("SHU") conditions, which, even when combined with the length of time spent in Ad Seg, have been repeatedly found not to meet the objective component, as a matter of law.  (*Id*.)   With regard to the subjective prong of Plaintiff's claim of inadequate conditions of confinement, Defendants argue that the record evidence undisputedly establishes that Defendants Bellnier and O'Gorman did not know of, and disregard, an excessive risk to Plaintiff's health or safety, because (a) Plaintiff's diagnosis of bipolar disorder predated his confinement, (b) Defendants afforded Plaintiff access to mental health services and treatment (including

medication and therapy), which he could have, but sometimes did not, avail himself of, and (c) Defendants also afforded Plaintiff access to daily interactions with Corrections Sergeants, a medical nurse, a mental health nurse, a round conducted by a correction officer every thirty minutes, an ability to converse with neighboring individuals, and weekly visits from senior facility officials.  (*Id*.)   Moreover, with regard to the subjective prong of Plaintiff's grossly-disproportionate-sentence claim, Defendants argue that there is no admissible record evidence from which a reasonable juror could find that Defendants Bellnier and O'Gorman acted without penological justification in continuing Plaintiff's Ad Seg confinement; rather, the record evidence undisputedly establishes that, in making the determinations to retain Plaintiff in Ad Seg, Defendants Bellnier and O'Gorman considered all of the factors of Plaintiff's behavior (including his initial crime of incarceration, his escape attempt, any misconduct that continued while in ad seg, the committees' concerns about his manipulative behavior, his periods of good behavior, his positive interactions with staff, and earned incentives), and that their decisions to continue to confine Plaintiff in Ad Seg were supported by the interest of maintaining the safety and security of the prison, the staff, other incarcerated individuals, and visitors.  (*Id*.)

Fourth, Defendants argue, Plaintiff's Fourteenth Amendment procedural due process claim (particularly against Defendants Bellnier and O'Gorman) must be dismissed, because Plaintiff has failed to adduce admissible record evidence from which a rational jury could find that the period reviews in question failed to satisfy any of the three criterial established by the Second Circuit in *Proctor v. LeClaire*: (1) that "the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified"; (2) that "the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or

will exist in the future, and consider new relevant evidence as it becomes available"; and (3) that "the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term." (*Id*. at 23-30.)   Rather, Defendants argue, the record evidence establishes that Defendants Bellnier and O'Gorman considered not just the incident that put Plaintiff in Ad Set but also new relevant evidence as it became available such as his response to Ad Seg, his interaction with staff and inmates (including any attempts at manipulation and any acts of violence), his disciplinary record, his participation in programing, and whether he remained a continued threat to the facility.   (*Id*. at 25-30.)[2]   As a result, Defendants argue that the facts in this case are different from those in *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 374-75 (N.D.N.Y. 2020) (Suddaby, C.J.), where this Court found that "a reasonable fact finder could conclude that Defendants used Plaintiff's remote violent conduct prior to being placed in Ad Seg (and his sporadic, relatively minor non-violent incidents while in Ad Seg) as a pretext for their desire to keep him in Ad Seg in order to punish him for past conduct."   (*Id*. at 30.)

Fifth, and finally, Defendants argue, in any event, based on the current record, they are protected by the doctrine of qualified immunity as a matter of law because (a) they have not violated any of Plaintiff's constitutional rights, and (b) reasonable officials would not have understood that their conduct in reviewing Plaintiff's confinement status pursuant to the standard clarified in *Proctor* violated any of Plaintiff's rights, or that his conditions of confinement violated the Eighth Amendment.   (*Id*. at 30-32.)

---

[2]     Defendants also argue that the fact that Plaintiff's Ad Seg reviews may not have been conducted every thirty or sixty days does not establish a Fourteenth Amendment violation, because failures to strictly adhere to state or institutional policy do not suffice to establish a constitutional violation.   (Dkt. No. 108, Attach. 1, at 24.)

### 2.   Plaintiff's Opposition Memorandum of Law

Generally, in his opposition, Plaintiff asserts five arguments.   (Dkt. No. 114.)   First, Plaintiff argues, the Court should deny Defendants' motion under Fed. R. Civ. P. 37(c)(1) and 56(d) for the following four reasons: (a) Defendants failed to disclose, either in their disclosures under Fed. R. Civ. P. 26(a)(1)(A)(i) or their discovery responses (such as their responses to Plaintiff's interrogatory requests dated December 20, 2021, or March 18, 2022), the identity and role of Kevin McCarthy, a non-defendant DOCCS employee who, from 2019 to May 2021, served as the chairman of the Central Office Administrative Segregation Review Committee ("COASRC") and thus personally "oversaw virtually all period review of inmates in Ad Seg" (which "must" include Plaintiff); (b) nonetheless, in support of their motion, Defendants rely on a declaration of McCarthy to describe the Ad Seg review process that is at the heart of this lawsuit; (c) as a result, Defendants are prohibited under Fed. R. Civ. P. 37(c)(1) from relying on testimony from McCarthy (and thus the Court should both deny Defendants' motion and award Plaintiffs reasonable attorneys fees caused by Defendants' failure to disclose); and (d) at a minimum, this Court should, under Fed. R. Civ. P. 56(d), defer ruling on Defendants' motion in order to allow Plaintiff to (i) take discovery regarding McCarthy's involvement in Plaintiff's Ad Seg reviews, and (ii) seek leave to file an Amended Complaint naming McCarthy as a Defendant (along with any other as-yet undisclosed direct participants in Plaintiff's Ad Seg reviews who are identified in that additional discovery).   (*Id*. at 14-18.)

Second, Plaintiff argues, although he does not oppose Defendants' argument regarding his due process claim against the Superintendent Defendants (Chappius, Reardon, Colvin, and Thomas), genuine issues of material fact preclude summary judgment on his due process claim

against the remaining Defendants (Annucci, O'Gorman, Bellnier, and Does 1-15)   for three

reasons: (a) genuine issues of material fact exist as to whether those Defendants indeed

considered new relevant evidence as it became available, given the fact that Plaintiff's behavior

was blemish-free for almost fourteen of the more-than fifteen years he remained in Ad Seg, and

the fact that his Ad Seg reviews are remarkably similar to those in *H'Shaka* and *Proctor v.*

*LeClaire*, 846 F.3d 597 (2d Cir. 2017); (b) genuine issues of material fact exist as to whether

those Defendants indeed maintained institutional safety and security as their "guiding principle"

in evaluating Plaintiff's confinement, given the fact that their long list of Ad Seg reviews

describing Plaintiff's conduct as "manipulative" appear to stem solely from his August 2011

refusal to attend group therapy, and the fact that the other "reasons" justifying his continued

confinement could similarly be construed as unrelated to security risks; and (c) genuine issues of

material fact exist as to whether those Defendants "actually evaluated" whether Plaintiff's

continued Ad Seg confinement was justified, given the length of time he was subjected to Ad

Seg and the length of time he exhibited positive behavior while in Ad Seg.   (*Id*. at 18-27.)

Third, Plaintiff argues, genuine issues of material fact preclude summary judgment on

Plaintiff's Eighth Amendment claims for two reasons: (a) genuine issues of material fact exist as

to whether the conditions of Plaintiff's confinement posed an unreasonable risk of serious

damage to his health, given that he was confined in Ad Seg for more than fifteen consecutive

years under conditions that offered him limited opportunities to meet his basic human needs

(including social and mental stimulation, basic sanitation, and sleep); and (b) genuine issues of

material fact exist as to whether Defendants imposed those conditions with deliberate

indifference, given the fact that Plaintiff's behavior was near blemish-free during the more-than

fifteen years he was in Ad Seg, and the fact that Defendants' decision to retain him there relied heavily on Plaintiff's past conduct (which, after a certain point in time, no longer constitutes a legitimate justification to continue to retain him).   (*Id.* at 27-33.)

Fourth, Plaintiff argues, Defendants are not entitled to qualified immunity, because (a) for the reasons previously stated, there are genuine issues of material fact about whether Defendants have violated Plaintiff's rights with respect to both claims, and (b) there have been more than five decades of Supreme Court and Second Circuit precedent clearly establishing Plaintiff's Eighth and Fourteenth Amendment rights to meaningful Ad Seg reviews and constitutionally sufficient conditions of confinement.   (*Id.* at 33-35.)

Fifth, and finally, Defendants argue, Plaintiff's claims against Defendant Annucci should not be dismissed, because (a) Plaintiff could be moved back to Ad Seg, (b) this possibility is likely given that DOCCS decision to retain Plaintiff in, and release him from, Ad Seg historically appears to be independent of any determination that he is to the safety and security of the facility, and (c) thus nothing prevents DOCCS from again confining Plaintiff in Ad Seg for the exact same reason that it confined him there seventeen years ago (with no thought given to his behaviors since then).   (*Id.* at 35-36.)

### 3.      Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants assert five arguments.   (Dkt. No. 118.)   First, Defendants argue, the McCarthy declaration does not warrant either the denial or deferment of their motion for three reasons: (a) although Defendants may have inadvertently failed to update their disclosures under Fed. R. Civ. P. 26(a)(1)(A)(i) by listing McCarthy as an individual likely to have discoverable information that Defendants may use in support of their defenses, any such

oversight was harmless, because Defendants never intended to use, and have in fact not used, McCarthy or any information he may possess in support of their defenses in this action (but rather they have used his declaration merely to provide background information and context regarding Ad Seg policies and procedures and Plaintiff's progression through the step-down program and release to general population, none of which should be a surprise to Plaintiff); (b) to the extent that Plaintiff complains that Defendants never identified McCarthy in response to Plaintiff's interrogatory request dated December 20, 2021 (requesting the identity of each and every person involved in each review of Plaintiff's Ad Seg confinement during the relevant time period), this is the first time that Plaintiff has challenged the sufficiency of that response (which did not list any individuals but merely directed Plaintiff to 637 pages of enclosed Ad Seg documents), and in any event McCarthy's involvement in the Ad Seg review process was, as a practical matter, so minor as to warrant his reference in the cc-line of only one email among those documents; and (c) in his deposition, Defendant O'Gorman several times mentioned the role of COASRC and its individual members in the Ad Seg review process (as did five other deponents in this action), and Plaintiff's failure to delve deeper into this topic during discovery lessens any prejudice that can be reasonably found to have been caused by Defendants.
(*Id*. at 3-7.)

Second, Defendants argue, Plaintiff does not oppose Defendants' request for summary judgment on his due process claim against Defendants Chappius, Reardon, Colvin, or Thomas; and Plaintiff fails to set forth any admissible record evidence creating a genuine issue of material fact precluding summary judgment on his due process claim against Defendants Bellnier and O'Gorman for four reasons: (a) Plaintiff's reliance on his blemish-free record for almost fourteen

years ignores the review committee's expressed concerns about releasing him into general

population based on his interaction with staff and inmates during that "blemish-free" period

(including instances when Plaintiff was perceived by staff to be coercive and manipulative, even

though he did not receive a misbehavior report, such as the instances from 2011, 2014, 2018,

2019 and 2020 that are listed on pages "25" and "26" of Defendants' memorandum of law-in

chief); (b) despite Plaintiff's arguments to the contrary, *Proctor* does not require the

establishment of unambiguously clear and concrete "goalposts" for an inmate's release from

Ag-Seg; (c) in response to Plaintiff's purported evidence that Defendants did not maintain

institutional safety and security as their "guiding principle," the long list of Ad Seg reviews

describing Plaintiff's conduct as "manipulative" clearly do not in fact stem from his refusal to

attend group therapy in August 2011 but stem from such behavior as his irately combining with

another inmate to drive out a third inmate from the Group Therapy Program in 2012, and his

causing every other inmate on the gallery to express the issue that Plaintiff had with visitation in

2020); and (d) in response to Plaintiff's purported evidence that Defendants did not "actually

evaluate[]" whether Plaintiff's continued Ad Seg confinement was justified, the mere fact that

Plaintiff maintained a clean disciplinary record for nearly fourteen of the more-than fifteen years

he was confined to Ad Seg does not support a finding by a rational juror that Defendants did not

"actually evaluate[]" whether Plaintiff's continued Ad Seg confinement was justified, given the

existence of the other record evidence demonstrating the level of thought that Defendants

Bellnier and O'Gorman put into Plaintiff's Ad Seg review process (including the

above-referenced evidence of Plaintiff's coercive and manipulative behavior during that

more-than fifteen year period).   (*Id*. at 8-14.)

Third, Defendants argue, Plaintiff fails to set forth any admissible record evidence creating a genuine issue of material fact precluding summary judgment on his two Eighth Amendment claims for two reasons: (a) as to the objective component of the two-part legal standard governing those claims, the conditions of confinement established by the record do not amount to anything more than general SHU conditions, which, even when combined with the length of time spent in Ad Seg, does not meet the objective component; and (2) as to the subjective component of the two-part legal standard governing those claims, (a) it is undisputed that none of the four Superintendent Defendants in this case (Reardon, Thomas, Colvin, and Chappius) had any authority to retain or release Plaintiff from confinement in Ad Seg (and all of those Defendants except Chappius do not even recall ever speaking with Plaintiff about his conditions of confinement), (b) Plaintiff's argument that those four Defendants should be liable because they were in charge of the facilities where Plaintiff was confined relies on nothing more than *respondeat superior* liability which is not available in cases arising under 42 U.S.C. § 1983, and (c) for the reasons stated in Defendants' memorandum of law-in chief, there is no admissible record evidence from which a reasonable juror could find that Defendants Bellnier and O'Gorman acted without penological justification in continuing Plaintiff's Ad Seg confinement. (*Id*. at 11-12.)

Fourth, Defendants argue, the Court should reject Plaintiff's argument for retaining his claims against Defendant Annucci in this action, because Plaintiff's argument ignores New York State's recent enactment of legislation that prevents Plaintiff from being moved back to Ad Seg for (1) more than fifteen consecutive days and/or (2) more than twenty total days within any sixty-day period.   (*Id.* at 11-12 [citing N.Y. Corr. Law § 137].)

Fifth, and finally, Defendants argue, the Court should disregard two ancillary documents provided by Plaintiff: (1) a document entitled "Plaintiff's Evidentiary Objections in Opposition to Defendants' Motion for Summary Judgment"; and (b) a document entitled "Plaintiff's "Statement of Additional Materials Facts in Dispute."  (*Id*. at 12-13.)   The first document should be disregarded, Defendants argue, because (a) it is not permitted under the District's Local Rules, (b) it is used by Plaintiff to circumvent the Court's page-limitation, and (c) it contains only nonsensical challenges to Defendants' declarations.   (*Id*. at 12.)   The second document should be disregarded, Defendants argue, because, rather than concisely set forth *factual* assertions that Plaintiff contends are in dispute, the document sets forth a wide range of *arguments* concerning Plaintiff's disciplinary history and alleged pretextual reasons for continued Ad Seg confinement.   (*Id*. at 12-13.)

### 4.    Plaintiff's Supplemental Opposition Memorandum of Law (filed After a Deposition of Non-Party Kevin McCarthy)

Generally, in a supplemental opposition,[3] Plaintiff argues that the Court should reject Defendants' request for judgment as a matter of law with regard to his Eighth Amendment conditions-of-confinement claim for two reasons: (1) although Defendants' memorandum of law cites Kevin McCarthy's declaration multiple times to support their argument that the extreme conditions of Plaintiff's confinement fail the objective prong (as well as the subjective prong) of that claim, in fact McCarthy's deposition transcript now shows that he possesses no personal knowledge of the Ad Seg conditions of the facilities in which Plaintiff was held because McCarthy was either never at that facility or not at that facility at the relevant time; and (2)

---

[3]      On November 13, 2023, the Court granted Plaintiff leave to file a supplemental opposition memorandum of law limited to new issues or arguments arising from Plaintiff's then-recently-authorized deposition of non-party Kevin McCarthy.   (Dkt. No. 131.)

without McCarthy's declaration, the Court is left with genuine disputes of fact regarding three material issues, specifically, (a) whether weekly rounds by chaplains actually and consistently occurred throughout the course of Plaintiff's more-than fifteen years in Ad Seg, (b) whether he was offered outdoor recreation on a daily basis where he was able to interact with others during that time period, and (c) whether he had consistent access to mental health services during that period (and whether, even if he did, Defendants acted with deliberate indifference in subjecting him to those conditions).   (Dkt. No. 132, at 3-8.)

### 5.     Defendants' Supplemental Reply Memorandum of Law

Generally, in their supplemental reply,[4] Defendants assert four arguments.   (Dkt. No. 133.)   First, Defendants argue, they never asserted that Kevin McCarthy possessed personal knowledge of the *specific* conditions of Plaintiff's confinement in Ad Seg at the facilities in which he was held; rather, his declaration (a) sets forth the *general* conditions of confinement in SHU and Residential Mental Health Unit ("RMHU") confinement, (b) asserts that Plaintiff would have been *generally* subject to those conditions (which have been held constitutional by cases), (c) compares Plaintiff's statements of the conditions he experienced to those general conditions, (d) provides the context of the regulatory scheme of Ad Seg, and (e) establishes the accurate dates of Plaintiff's progression through the step-down program.   (*Id*. at 3-5.)

Second, Defendants argue, for the reasons stated above as well as stated in Defendants' prior memoranda of law, Plaintiff fails to identify a genuine dispute of material fact precluding the entry of summary judgment in Defendants' favor on Plaintiff's Eighth Amendment claims. (*Id*. at 5.)

---

[4]     On November 13, 2023, the Court granted Defendants leave to file a supplemental reply memorandum of law limited to responding to Plaintiff's supplemental opposition memorandum of law.   (Dkt. No. 131.)

Third, Defendants argue, for the same reasons that the Court should disregard Plaintiff's 14-page original "Statement of Additional Materials Facts in Dispute," the Court should disregard Plaintiff's 15-page "Amended and Supplemental Statement of Additional Materials Facts in Dispute": rather than concisely set forth *factual* assertions that Plaintiff contends are in dispute, the document continues to set forth a wide range of *arguments* concerning Plaintiff's disciplinary history and alleged pretextual reasons for continued Ad Seg confinement.   (*Id*. at 5.)

Fourth, Defendants argue, for the same reasons that the Court should dismiss Plaintiff's remaining claims (which are all for injunctive relief) against Defendant Annucci, the Court should dismiss Plaintiff's remaining claims against Annucci's successor in office, Daniel F. Martuscello III (now that Annucci has retired as of June 9, 2023).   (*Id*. at 5-6.)

### 6.   Oral Argument

Following completion of the briefing on Defendants' motion, the Court heard more than 40 minutes of oral argument by Andrew Kunsak, Esq., Cassandra Liu, Esq., and Leslie Kuhn-Thayer, Esq. for Plaintiff, and by Assistant Attorney General Lauren Rose Eversley, for Defendants.   (Text Minute Entry dated March 19, 2024.)

### C.   Statement of Material Facts

Generally, unless otherwise noted, the following facts have been asserted and supported by Defendants in their Statement of Material Facts and admitted by Plaintiff in his Response thereto (either expressly or due to his failure to support a specific denial with a citation to admissible record evidence).   (*Compare* Dkt. No. 108, Attach. 8 [Defs.' Rule 56.1 Statement] *with* Dkt. No. 132, Attach. 1, at 41-65 [Plf.'s Amend. and Suppl. Rule 56.1 Response].)

<u>Plaintiff's Underlying Offense and History within DOCCS</u>

1.      Plaintiff Troy Hendrix first entered DOCCS custody in 2006 after convictions for Murder in the First Degree, two counts of Kidnapping in the First Degree, and Rape in the First Degree.

2.      Plaintiff and another individual dragged a victim into the basement apartment of his home, bound her, raped and tortured her, cut her with saws, burned her with cigarettes, and struck her multiple times in the head and chest with a hammer, causing her death.

3.      A few days later, Plaintiff and another individual led a second victim into the basement with an intent to commit a crime. After she was bound, Plaintiff and the second individual repeatedly raped and sodomized her.

4.      In January of 2006, at a sentencing hearing for his underlying offenses, while armed with a homemade plastic knife, Plaintiff jumped over a table and attempted to grab a court officer's firearm, while his co-defendant stabbed his lawyer in the neck with a plastic shank.[5]

5.      On November 20, 2006, based on his actions during the sentencing hearing, Plaintiff was convicted of First-Degree Attempted Assault, Second-Degree Attempted Robbery, and First-Degree Attempted Escape.

---

[5]      (Dkt. No. 108, Attach. 16, at ¶ 25 [O'Gorman Decl.]; Dkt. No. 108, Attach. 15, at ¶ 23 [Bellnier Decl.]; Dkt. No. 108, Attach. 4, at 24-28 [attaching pages "23" through "27" of Plf.'s Depo. Tr.].)   Although in his partial denial Plaintiff takes issue with Defendants' assertion that he attempted *escape* at the time of the incident as opposed to attempting to *provoke* the officers to shoot and kill him (Dkt. No. 132, Attach. 1, at 44-45 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the record evidence he cites establishes that he possessed a homemade plastic knife at the time, attempted to grab the officer's gun, and was subsequently convicted of attempted escape (among other things).   (Dkt. No. 108, Attach. 4, at 24-28 [attaching pages "23" through "27" of Plf.'s Depo. Tr.].)   Moreover, his denial of knowledge of his co-defendant's actions is insufficient to create a genuine dispute of material fact on the subject. *See, e.g., Percoco v. Lowe's Home Ctrs., LLC*, 208 F. Supp. 3d 437, 440 n.2 (D. Conn. 2016); *In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015).   Finally, the Court rejects his argument that his co-defendant's actions are immaterial, because they are probative of whether Defendant was, in fact, intending to escape at the time.

6.      At a sentencing hearing for the convictions stemming from the January 2006 court appearance, Plaintiff stated to the sentencing judge, "[T]he only regret I have is not getting that gun out of that holster."

7.      On April 17, 2006, Plaintiff entered the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

8.      On December 8, 2006, based on his convictions stemming from the January 2006 court appearance, DOCCS formally recommended that Plaintiff be placed in Administrative Segregation ("Ad Seg") on the ground that he was "an assaultive escape risk who [was] a threat to the safety and security and employees of any facility he is housed in."[6]

9.      During Plaintiff's placement in Ad Seg, he accrued misbehavior reports for various offenses. For example, he received misbehavior reports for the following offenses on or about the following dates: loss or damage to property (February 17, 2012); an unhygienic act (March 25, 2012); creating a disturbance (April 6, 2012); smuggling (May 21, 2012); and violent conduct, assault on another incarcerated individual, and use of a weapon (January 6, 2020). (Dkt. No. 108, Attach. 13, at 15.)[7]

---

[6]      Although in his partial denial Plaintiff denies any *implication* that he was not in conditions substantially different from Ad Seg between April 17, 2006, and December 8, 2006 (Dkt. No. 132, Attach. 1, at 44 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the above-stated fact (which speaks of a "formal[] recommend[ation]") contains no such assertion; and it is *factual assertions* that are admitted or denied in a Rule 56.1 Response. *See* N.D.N.Y. L.R. 56.1(b) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs.") (emphasis added); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).

[7]      Although in his partial denial Plaintiff denies that he "continued to accrue" misbehavior reports, he admits that he accrued each of the above-listed misbehavior reports.   (Dkt. No. 132, Attach. 1, at 44-45 [Plf.'s Amend. and Suppl. Rule 56.1 Response].)   The Court notes that the Inmate Disciplinary History relied on by both sides indicates that Plaintiff received numerous

10.     At all relevant times to Plaintiff's claims in this action, Plaintiff was confined to Elmira Correctional Facility ("Elmira"), Marcy Correctional Facility ("Marcy"), and Five Points Correctional Facility ("Five Points").

<u>Typical SHU and RMHU Conditions</u>

11.     Incarcerated individuals housed in the Special Housing Unit ("SHU") typically remain in their cell for 23 hours per day and are allowed outdoors for one hour of recreation in an individual recreation cell.

12.     In addition, incarcerated individuals housed in SHU typically could converse with other inmates through their cell doors or during recreation, could interact with officers during rounds occurring every 30 minutes, had access to a religious chaplain, and were entitled to at least 3 showers per week with an opportunity to earn more.[8]

13.     Finally, incarcerated individuals housed in SHU *typically* were subject to daily rounds performed by a medical nurse, and OMH nurse, and an OMH counsel.[9]

14.     Meanwhile, while in Residential Mental Health Unit ("RMHU"), Ad Seg

---

[8]     (Dkt. No. 108, Attach. 14, at ¶ 35 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 12 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017].) Although Kevin McCarthy lacks personal knowledge of the *specific* conditions of confinement that *Plaintiff* experienced while in Ad Seg at the facilities in which he was held, he is competent to adduce admissible record evidence regarding the *typical* conditions of confinement experienced by *incarcerated individuals* housed in SHU in DOCCS facilities during the time in question (because of his knowledge and application of DOCCS Directive 4933 for nearly two decades, not to mention the general observations he has made as a deputy superintendent at Elmira C.F. since 1991).   (Dkt. No. 108, Attach. 14, at ¶¶ 1-4, 6-10, 33 [McCarthy Decl.]; Dkt. No. 132, Attach. 3, at 3-5, 13, 15 [McCarthy Depo. Tr.].)

[9]     *See, supra,* note 8 of this Decision and Order.

individuals typically were subject to the same general conditions as in SHU and were typically entitled to additional programming (including congregate programing), OMH services, and time out of their cells.[10]

15.     Throughout his incarceration, and specifically during the relevant period, Plaintiff had access to mental health services.

<u>Administrative Confinement</u>

16.     Plaintiff's Ad Seg status was evaluated pursuant to a Central Office review.

17.     During the time in question, after an inmate was placed in Ad Seg status, following the original Ad Seg departmental hearing, the inmate's Ad Seg status was subject to a three-step periodic review, which process was described in the version of DOCCS Directive 4933 that is dated April 18, 2017.   Reviews of an inmate's Ad Seg status are required to be conducted periodically.   Between December 8, 2006, and September 15, 2021, Defendants conducted numerous reviews of Plaintiff's Ad Seg status.[11]

18.     When incarcerated individuals are involuntarily placed into Ad Seg, *typically* they are done so only after a departmental hearing is held to determine if they fit the criteria to be placed into Administrative Segregation.   The version of DOCCS Directive 4933 in effect during

---

[10]     (Dkt. No. 108, Attach. 14, at ¶ 36 [McCarthy Decl.].)   Although Kevin McCarthy lacks personal knowledge of the level of programming and services *actually* provided to *Plaintiff* while in RMHU at the facilities in which he was held, he is competent to adduce admissible record evidence regarding the level of programming and services *typically* provided to *Ad Seg individuals* in RMHU in DOCCS facilities during the time in question.   (Dkt. No. 108, Attach. 14, at ¶¶ 1-4, 6-10, 33, 34 [McCarthy Decl.]; Dkt. No. 132, Attach. 3, at 3-5, 13, 15 [McCarthy Depo. Tr.].)

[11]     (Dkt. No. 108, Attach. 14, at ¶ 14 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10-11 [Ex. A to McCarthy Decl., attaching relevant pages of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 108, Attach. 21-28 [Plf.'s Ad Seg Records]; Dkt. No. 132, Attach. 1, at 48 [Plf.'s Amend. and Suppl. Rule 56.1 Response, partially admitted above-stated fact].)

the time in question required that hearing to be held "within 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation recommendation made by the employee who ascertained the facts or circumstances."[12]

19.     Although Ad Seg is a status and not a location within a prison, inmates on Ad Seg status are housed within the SHU.[13]

20.     An inmate is involuntarily placed in Ad Seg if it is determined by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility.[14]

21.     DOCCS Acting Commissioner has no involvement in the foregoing review process, nor did he have such involvement during the time in question.[15]

22.     During the time in question, Defendant Annucci made no formal recommendation as part of the Ad Seg review process.

23.     Similarly, the facility Superintendents (Defendants Chappius, Reardon, Colvin,

---

[12]     (Dkt. No. 108, Attach. 14, at ¶ 12 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at ¶ 14 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017].)

[13]     (Dkt. No. 108, Attach. 14, at ¶ 13 [McCarthy Decl.]; Dkt. No. 108, Attach. 7, at 63 [O'Gorman Depo. Tr.].)

[14]     (Dkt. No. 108, Attach. 14, at ¶ 13 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017].) Although Plaintiff denies that this standard is consistently followed in practice (Dkt. No. 132, Attach. 1, at 49 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the deposition testimony he cites in support of that denial speaks not of the Ad Seg *admission* (or placement) criteria but of the Ad Seg *release* criteria.   (Dkt. No. 132, Attach. 3, at 11-12 [McCarthy Depo. Tr.].)   The Court respectfully directs Plaintiff's attention to the difference between § 301.4(b) and § 301.4(d)(1),(2) of DOCCS Directive 4933 dated Apr. 18, 2017.   (Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl.].)

[15]     (Dkt. No. 108, Attach. 14, at ¶ 31 [McCarthy Decl.].)

and Thomas) had no involvement in the determination to place Plaintiff in Ad Seg, and made no

formal recommendation as part of the Ad Seg review process.

24.     Nor were the facility Superintendents members of the facility-level committee.

25.     During the time in question, once an individual was placed in Ad Seg, the

appropriateness of continued Ad Seg confinement was assessed through a three-step review

process.

26.     As the Director of the Crisis Intervention Unit ("CIU") from 2019 to May 2021,

Kevin McCarthy was responsible for ensuring that facility level review committee meetings were

conducted, which he did by reviewing the paperwork that they submitted on a monthly basis.

Generally, each facility level review committee was comprised of a member of the counseling

staff, an officer familiar with the individual being reviewed, and a senior security staff

member.[16]

27.     Until July 2017, the Ad Seg review period that was required by the version of

DOCCS 4933 then in effect was every sixty days.

28.     Between July 2017 and when DOCCS Directive 4933 was amended in

accordance with N.Y. Correct. Law § 137, the Ad Seg review period that was required by the

version of DOCCS 4933 then in effect was every seven days for the first sixty days that an

---

[16]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 15 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8 [McCarthy Depo. Tr.]; Dkt. No. 132, Attach. 1, at 51 [Plf.'s Amend. and Suppl. Rule 56.1 Response, failing to expressly deny, and in fact citing record evidence establishing, the above-stated facts].)   *See*   N.D.N.Y. L.R. 56.1(b) ("The non-movant's response shall mirror the movant's Statement of Material Facts by *admitting and/or denying* each of the movant's assertions in matching numbered paragraphs.") (emphasis added); *cf. In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("[A] response contending to neither admit or deny an allegation does not create a genuine issue of fact.").

individual was deemed appropriate for Ad Seg status, then every thirty days thereafter.

29.    Based on his review of the paperwork submitted by facility committees on a monthly basis from 2019 to May 2021, it is Kevin McCarthy's understanding that, generally, during at least that time period, each facility committee reviewed any documents that the incarcerated individual had submitted for consideration.[17]

30.    Again based on his review of the paperwork submitted by facility committees on a monthly basis from 2019 to May 2021, it is Kevin McCarthy's understanding that, generally, during at least that time period, each facility committee made its recommendation, and all committee members signed the document, after they had considered all of the factors regarding an inmate's past and present behavior.[18]

31.    Again based on his review of the paperwork submitted by facility committees on a monthly basis from 2019 to May 2021, it is Kevin McCarthy's experience that, generally, during at least that time period, each recommendation of a facility committee was recorded on a document that contained three sections: (1) the reasons the individual was initially placed in Ad Seg; (2) subsequent behavior and attitude; and (3) other factors that may favor retaining or releasing the individual from Ad Seg.[19]

---

[17]    (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 16 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8 [McCarthy Depo. Tr.].)

[18]    (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 19 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8 [McCarthy Depo. Tr.].)

[19]    (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 17 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8 [McCarthy Depo. Tr.].)   Although in his partial denial Plaintiff denies that the recommendations in his case resulted from a bona fide process consistent with the requirements of the Fourteenth Amendment and that the documents recorded are a bona

32.     Again based on his review of the paperwork submitted by facility committees on a monthly basis from 2019 to May 2021, it is Kevin McCarthy's experience that, generally, during at least that time period, the first section describing the reasons an individual was initially deemed appropriate for Administrative Segregation never changed, because it was historical information describing the offense or offenses that led to an individual's designation in Ad Seg.[20]

33.     None of the named Defendants in this action were a part of the facility-level review committee during the relevant time periods in this litigation.

34.     Generally, from at least 2016 to May 2021 (when McCarthy was either the Assistant Chairman or Chairman of the Central Office Administrative Segregation Review Committee or "COASRC"), following the recommendation by the facility-level committee, the COASRC met in person to evaluate each of the individuals held in Ad Seg throughout all DOCCS facilities.[21]

---

fide record of everything that motivated the recommendation to keep Plaintiff in Ad Seg (Dkt. No. 132, Attach. 1, at 55 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the above-stated fact contains no such assertions.   Simply stated, Plaintiff has ineffectually denied perceived implications of fact, not actual assertions of facts.   *See, supra,* note 6 of this Decision and Order.

[20]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 19 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8 [McCarthy Depo. Tr.].)   Again, by partially denying an implication regarding the first section of his recommendations (Dkt. No. 132, Attach. 1, at 55-56 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), Plaintiff has ineffectually denied perceived implications of fact, not actual assertions of facts.   *See, supra,* note 6 of this Decision and Order.

[21]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 20 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) In addition to improperly failing to expressly admit or deny the above-stated fact, Plaintiff denies personal knowledge of it. (Dkt. No. 132, Attach. 1, at 57 [Plf.'s Amend. and Suppl. Rule 56.1 Response].) Again, such a denial of knowledge is insufficient to create a genuine dispute of material fact on the subject. *See, supra,* note 5 of this Decision and Order.

35.     Generally, from at least 2016 to May 2021, these COASRC meetings were pre-scheduled, and not all Ad Seg individuals were necessarily reviewed on the same day. Notwithstanding that fact, generally, each Ad Seg inmate was reviewed by the COASRC every 30 days.[22]

36.     The three-person COASRC was comprised of the chairman or his designee, an attorney representative from the DOCCS Counsel's Office, and a representative from the Office of Special Investigations.

37.     From at least 2016 to May 2021, the only restriction on membership on the COASRC was that the employee who made the initial recommendation for placement in Ad Seg for a particular individual shall not serve as a member of that individual's periodic review board. This was done to avoid any conflict of interest and/or to avoid bias, or the appearance of unfair bias.[23]

38.     In Kevin McCarthy's experience, from at least 2016 to May 2021, no individual member of the COASRC had a greater say in the recommendation, regardless of title or position, and no member was pressured to recommend a certain outcome for any individual.[24]

---

[22]     *See, supra,* note 21 of this Decision and Order.

[23]     In addition to improperly failing to expressly admit or deny the above-stated fact, Plaintiff ineffectually denies personal knowledge of it.   (Dkt. No. 132, Attach. 1, at 57 [Plf.'s Amend. and Suppl. Rule 56.1 Response].) *See, supra,* note 5 of this Decision and Order.

[24]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 22 [McCarthy Decl.]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) Although in his partial denial Plaintiff denies that the recommendations were the result of bona fide process consistent with the requirements of the Fourteenth Amendment (Dkt. No. 132, Attach. 1, at 58 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the above-stated fact contains no such assertion.   In this sense, Plaintiff has yet again ineffectually denied a perceived implication of fact, not an actual assertion of facts.   *See, supra,* note 6 of this Decision and Order.   Moreover, Plaintiff's assertion he is not able to assess from the present record whether the COASRC members have been pressured by their superiors to join in the violation of his constitutional rights is a thinly veiled acknowledgment that he lacks

24

39.     Generally, from at least 2016 to May 2021, during the meeting of the COASRC,

the COASRC reviewed the written recommendation made by the facility-level committee, as

well as any document submitted by the individual.[25]

40.     Generally, from at least 2016 to May 2021, in addition to relying on the

above-referenced written reports, the Chairman of the COASRC facilitated a phone conference

with the facility that houses each particular individual to discuss up-to-the-minute issues, events,

and an explanation and clarification of the recommendations regarding that individual.[26]

---

of personal knowledge of the above-stated fact, which again is insufficient to create a genuine
dispute of material fact with regard to it.   *See, supra,* note 5 of this Decision and Order.

[25]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 24 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at
10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18,
2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) In addition to improperly
failing to expressly admit or deny the above-stated fact, Plaintiff ineffectually denies personal
knowledge of it.    (Dkt. No. 132, Attach. 1, at 58 [Plf.'s Amend. and Suppl. Rule 56.1
Response].)   *See, supra,* note 5 of this Decision and Order.   Finally, the Court notes that
Plaintiff's demand for documentary evidence confirming this declarant's sworn statements is
nothing but an ineffectual challenge to the declarant's credibility.   *See Zito v. Fried, Frank,
Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 391 (S.D.N.Y. 2012) ("Neither
conclusory assertions, nor contentions that the affidavits supporting the motion are not credible,
create a genuine issue of material fact."); *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431,
439 (S.D.N.Y. 2007) ("[T]he burden is one of production, not persuasion; it can involve no
credibility assessment."); *Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378
(S.D.N.Y. 1979) ("[A] naked attack upon the affidavits of a moving party is, without more,
insufficient to place the credibility of the affiant in issue.").   In other words, the declarant's
sworn assertions, which are based on personal knowledge and steer clear of legal conclusions,
suffice to constitute admissible evidence, even without extrinsic corroboration.   *See, e.g., Levin
v. Abramson*, 18-CV-1723, 2020 WL 2494649, at *19 (N.D. Ill. May 13, 2020) ("The court does
not need to address this argument [that extrinsic evidence is required] because Levin's
declarations provide independent support for her claims. Abramson argues that the declarations
are 'self-serving,' but the term 'self-serving' may not be used to denigrate perfectly admissible
evidence through which a party tries to present its side of the story at summary judgment.")
(internal quotation marks omitted).

[26]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 25 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at
10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18,
2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) In addition to improperly
failing to expressly admit or deny the above-stated fact, Plaintiff ineffectually denies personal

41.     Generally, from at least 2016 to May 2021, this phone call was with the Deputy Superintendent of Security or a Security Captain at the facility that currently housed the individual, and was not always with the same person.[27]

42.     Generally, from at least 2016 to May 2021, for an individual housed in an RMHU, a representative from the RMHU participated in this conference.[28]

43.     Generally, from at least 2016 to May 2021, factors discussed included the individual's medical health, mental health (regardless of whether or not an individual was under the care of the Office of Mental Health or "OMH"), general demeanor with staff and other individuals, any change in the individual's mood, behavior, or routine, daily living skills, personal hygiene, and cell cleanliness, and what, if any, Progressive Inmate Movement System ("PIMS") privileges were afforded and utilized.[29]

44.     Generally, from at least 2016 to May 2021, in addition, the COASRC and the facility contact discussed any statements the individual had made about being in Ad Seg, letters

---

knowledge of it. (Dkt. No. 132, Attach. 1, at 58 [Plf.'s Amend. and Suppl. Rule 56.1 Response].) *See, supra,* note 5 of this Decision and Order.   Moreover, Plaintiff's demand for documentary evidence confirming this declarant's sworn statements is nothing but an ineffectual challenge to the declarant's credibility.   *See, supra,* note 25 of this Decision and Order.

[27]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 26 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) In addition to improperly failing to expressly admit or deny the above-stated fact, Plaintiff ineffectually denies personal knowledge of it.  (Dkt. No. 132, Attach. 1, at 59 [Plf.'s Amend. and Suppl. Rule 56.1 Response].)   *See, supra,* note 5 of this Decision and Order.   Moreover, again, Plaintiff's demand for documentary evidence confirming this declarant's sworn statements is nothing but an ineffectual challenge to the declarant's credibility.   *See, supra,* note 25 of this Decision and Order.

[28]     *See, supra,* note 27 of this Decision and Order.

[29]     *See, supra,* note 27 of this Decision and Order.

the individual had sent, concerns the individual had had about being in Ad Seg, and interactions that the facility had noted between the individuals and others.[30]

45.     Generally, from at least 2016 to May 2021, the COASRC also discussed whether the individual violated any prison rules.[31]

46.     Generally, from at least 2016 to May 2021, at times during this phone conference, COASRC asked the facilities to reach out to service providers or other DOCCS staff for further information regarding the individual.[32]

47.     Generally, from at least 2016 to May 2021, following the discussion with the facility, and the review of all associated paperwork, the COASRC made a recommendation regarding the need for continued Ad Seg placement for each individual.[33]

48.     DOCCS is charged with determining whether the individual under consideration presents a current threat to the safe, secure operation of the facility, and what future threats

---

[30]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 27 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) In addition to improperly failing to expressly admit or deny the above-stated fact, Plaintiff ineffectually denies personal knowledge of it. (Dkt. No. 132, Attach. 1, at 60 [Plf.'s Amend. and Suppl. Rule 56.1 Response].) *See, supra,* note 5 of this Decision and Order.   Moreover, again, Plaintiff's demand for documentary evidence confirming this declarant's sworn statements is nothing but an ineffectual challenge to the declarant's credibility.   *See, supra,* note 25 of this Decision and Order.

[31]     *See, supra,* note 30 of this Decision and Order.

[32]     *See, supra,* note 30 of this Decision and Order.

[33]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 29 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].)   Although in his denial Plaintiff denies that the recommendations in his case were the result of bona fide process consistent with the requirements of the Fourteenth Amendment (Dkt. No. 132, Attach. 1, at 60-61 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the above-stated fact contains no such assertion.   In this sense, Plaintiff has yet again ineffectually denied a perceived implication of fact, not an actual assertion of facts.   *See, supra,* note 6 of this Decision and Order.

would be posed by release from Ad Seg.

49.     Generally, from at least 2016 to May 2021, the COASRC's recommendation was memorialized in writing, using additional typed pages where necessary, and sent to the Deputy Commissioner for Correctional Facilities, who made a final determination.[34]

50.     None of the Defendants in this action served on the COASRC during the relevant time-period.

51.     Generally, from at least November 2011 to December 30, 2020, the Deputy Commissioner for Correctional Facilities reviewed all of the information provided by each of the committees and made a final determination as to an Ad Seg inmate's status, after considering all aspects of an Ad Seg inmate's behavior and the safety and security of the prison.[35]

---

[34]     (Dkt. No. 108, Attach. 14, at ¶¶ 6-10, 29 [McCarthy Decl.]; Dkt. No. 108, Attach. 14, at 10 [Ex. A to McCarthy Decl., attaching relevant page of DOCCS Directive 4933 dated Apr. 18, 2017]; Dkt. No. 132, Attach. 3, at 4, 6-8, 40 [McCarthy Depo. Tr.].) Although in his partial denial Plaintiff denies that these writings reflected the COASRC's actual rationale and that the recommendations in his case were the result of bona fide process consistent with the requirements of the Fourteenth Amendment (Dkt. No. 132, Attach. 1, at 61 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the above-stated fact contains no such assertions.  In this sense, Plaintiff has yet again ineffectually denied a perceived implication of fact, not an actual assertion of facts.  *See, supra,* note 6 of this Decision and Order.  Moreover, Plaintiff's assertion about COASRC's "actual rationale" is unsupported by any specific citation to admissible record evidence creating a genuine dispute of material fact on that subject.  (Dkt. No. 132, Attach. 1, at ¶ 53 [Plf.'s Rule 56.1 Response].)

[35]     (Dkt. No. 108, Attach. 15, at ¶¶ 5, 7, 16, 18-20, 33 [Bellnier Decl.]; Dkt. No. 108, Attach. 16, at ¶¶ 6-7, 17-19, 36 [O'Gorman Decl.].) Although Plaintiff denies the above-stated fact, he cites no admissible record evidence in support of that denial.  (Dkt. No. 132, Attach. 1, at 61 [Plf.'s Amend. and Suppl. Rule 56.1 Response].)  Moreover, Plaintiff's characterization of these declarants' testimony as self-serving, like his demand for documentary evidence confirming their sworn statements, is nothing but an ineffectual challenge to the declarants' credibility.  *See Island Software and Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact.");*McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely by "impugning [a witness'] honesty").

52.     Both the facility-level review committee and the COASRC have consistently recommended that Plaintiff remain in Ad Seg.

53.     During the time in question in this litigation, Defendants Chappius, Reardon, Colvin, and Thomas did not have the authority to release Plaintiff from Ad Seg.[36]

54.     Defendants Bellnier and O'Gorman served as the Deputy Commissioner who was tasked with the final determination of Plaintiff's Ad Seg designation for each periodic review.

55.     From November 2011 until his retirement in September 2017, Defendant Bellnier was responsible for the review of Plaintiff's Ad Seg status.

56.     Defendant Bellnier's personal evaluation of Plaintiff during each of the review periods involved reading and considering the recommendations of each review committee, reviewing any attached correspondence from Plaintiff, and seriously considering all aspects of Plaintiff's behavior (including his current and recent behavior).[37]

57.     Defendant O'Gorman served as the Deputy Commissioner from September 2017 until his retirement in December 2020.

---

[36]     Although in his partial denial Plaintiff denies the implication that these Defendants could have no influence on whether or not Plaintiff was released because they could have recommended his release from Ad Seg (Dkt. No. 132, Attach. 1, at 62 [Plf.'s Amend. and Suppl. Rule 56.1 Response]), the above-stated fact contains no such assertions.   As a result, Plaintiff has yet again ineffectually denied a perceived implication of fact, not an actual assertion of facts. *See, supra,* note 6 of this Decision and Order.   In any event, the recommendation referenced by Plaintiff was rejected, further foreclosing a reasonable finding that these Defendants possessed the authority to release Plaintiff from Ad Seg.

[37]     (Dkt. No. 108, Attach. 15, at ¶¶ 18, 19, 26, 32 [Bellnier Decl.].)   Again, Plaintiff's demand for documentary evidence confirming Defendant Bellnier's sworn statements is nothing but an ineffectual challenge to his credibility.   (Dkt. No. 132, Attach. 1, at 62 [Plf.'s Amend. and Suppl. Rule 56.1 Response].)   *See, supra,* note 25 of this Decision and Order. Moreover, Plaintiff's denial that Bellnier's determinations were the result of bona fide process consistent with the requirements of the Fourteenth Amendment does not successfully deny any factual assertion contained in the above-stated fact but only ineffectually denies a perceived implication of fact.   *See, supra,* note 6 of this Decision and Order.

58.     When making his final determination as to Plaintiff's continued confinement in or release from Ad Seg, Defendant O'Gorman considered, among other things, the recommendations of each review committee and all aspects of Plaintiff's behavior (including his past, current, and future behavior).[38]

59.     Both Defendants Bellnier and O'Gorman based their determinations regarding Plaintiff on the ultimate goal of Ad Seg: maintaining a safe and secure prison environment for visitors, staff, and other incarcerated individuals.[39]

60.     In so doing, they weighed whether Plaintiff's history of violence and propensity for escape had dissipated after his periods of good conduct while in SHU in Ad Seg status.[40]

---

[38]     (Dkt. No. 108, Attach. 16, at ¶¶ 23, 28-38, 47, 48 [O'Gorman Decl.].)   Plaintiff's denial that O'Gorman's determinations were the result of bona fide process consistent with the requirements of the Fourteenth Amendment does not successfully deny any factual assertion contained in the above-stated fact but only ineffectually denies a perceived implication of fact. (Dkt. No. 132, Attach. 1, at 63 [Plf.'s Amend. and Suppl. Rule 56.1 Response].)   *See, supra,* note 6 of this Decision and Order.   Furthermore, the record evidence that Plaintiff (improperly) seeks to incorporate by reference in his response does not actually controvert any portion of the above-stated fact.

[39]     (Dkt. No. 108, Attach. 15, at ¶¶ 20, 30, 33 [Bellnier Decl.]; Dkt. No. 108, Attach. 16, at ¶¶ 17-19, 22, 28, 30, 34, 47 [O'Gorman Decl.].)   Again, Plaintiff's demand for documentary evidence confirming these declarants' sworn statements is nothing but an ineffectual challenge to their credibility. (Dkt. No. 132, Attach. 1, at 63 [Plf.'s Amend. and Suppl. Rule 56.1 Response].) *See, supra,* note 25 of this Decision and Order. Moreover, Plaintiff's denial that their determinations were the result of bona fide process consistent with the requirements of the Fourteenth Amendment does not successfully deny any factual assertion contained in the above-stated fact but only ineffectually denies a perceived implication of fact.   *See, supra,* note 6 of this Decision and Order.

[40]     (Dkt. No. 108, Attach. 15, at ¶¶ 21-23, 26-27, 30 [Bellnier Decl.]; Dkt. No. 108, Attach. 16, at ¶¶ 25, 29, 30-32, 37 [O'Gorman Decl.].)   Again, Plaintiff's demand for documentary evidence confirming these declarants' sworn statements is nothing but an ineffectual challenge to their credibility.   (Dkt. No. 132, Attach. 1, at 64 [Plf.'s Amend. and Suppl. Rule 56.1 Response].) *See, supra,* note 25 of this Decision and Order. Moreover, Plaintiff's denial that their determinations were the result of bona fide process consistent with the requirements of the Fourteenth Amendment does not successfully deny any factual assertion contained in the above-stated fact but only ineffectually denies a perceived implication of fact.   *See, supra,* note

61.     In November 2021, Plaintiff transferred to a step-down program. Generally, this program provided an individual with more movement and personal interaction with staff and other incarcerated individuals, and allowed staff to better assess the individual's improvement.[41]

62.     On July 27, 2022, Plaintiff was released from Ad Seg and returned to the general population.

## II.     GOVERNING LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[42] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes

___

6 of this Decision and Order.

[41]     (Dkt. No. 108, Attach. 14, at ¶ 38 [McCarthy Decl.]; Dkt. No. 108, Attach. 16, at ¶ 43 [O'Gorman Decl.].)

[42]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[43]   Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).   Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1(a).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[44]

---

[43]       *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[44]       Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[45]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Whether Plaintiff's Claims for Injunctive Relief Against Defendant Annucci (or His Successor in Office, Daniel F. Martuscello III) Must Be Dismissed

After carefully considering this issue, the Court answers this question in the affirmative for the reasons stated by Defendants in their memoranda of law: there is no injunctive relief left for Annucci (or his successor in office Martuscello) to provide. *See, supra,* Parts I.B.1., I.B.3.,

---

[45]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

and I.B.5. of this Decision and Order.   To those reasons, the Court adds only two points.

First, Plaintiff's release to general population on July 27, 2022, coupled with the change to N.Y. Corr. Law § 137(i)(i)[46] that went into effect on March 31, 2022, have made it absolutely clear that the allegedly wrongful behavior claimed in this action could not reasonably be expected to recur.   *See United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.").

Second, although during oral argument Plaintiff's counsel represented (without a case citation) that "there are allegations, in fact, [in] a lawsuit just filed last month, of DOCCS not following the HALT Act and keeping prisoners in solitary confinement . . . " (Hrg. Tr. at 26), of course, mere allegations (especially regarding other individuals and/or facilities) do no constitute *evidence* that the violations of Plaintiff's rights claimed in this action are reasonably expected to recur. *Cf. Walker v. Capra*, 22-CV-7638, 2024 WL 21938, at *5-6 (S.D.N.Y. Jan. 2, 2024) (granting defendants' partial motion to dismiss an amended complaint asserting claim that four supervisory Defendants had violated the HALT Act at Sing Sing C.F., based on those Defendants' lack of personal involvement).

**B.      Whether Plaintiff's Fourteenth Amendment Claim Against the Superintendent Defendants (Chappius, Reardon, Colvin, or Thomas) Must Be Dismissed**

After carefully considering this issue, the Court answers this question in the affirmative

---

[46]      *See* N.Y. Corr. Law § 137(i)(i) ("No person may be placed in segregated confinement for longer than necessary and no more than fifteen consecutive days. Nor shall any person be placed in segregated confinement for more than twenty total days within any sixty day period except as otherwise provided in subparagraph (ii) of this paragraph."); *cf.* N.Y. Corr. Law § 137(k)(iii) ("No person may be placed in segregated confinement or a residential rehabilitation unit based on the same act or incident that was previously used as the basis for such placement.").

for the reasons stated by Defendants in their memoranda of law (i.e., the lack of admissible record evidence establishing these four superintendent Defendants' personal involvement in this alleged constitutional violation), and the fact that Plaintiff does not oppose those reasons in his opposition memorandum of law. *See, supra,* Parts I.B.1., I.B.2., and I.B.3. of this Decision and Order.   (*Id.* at 12-17.)[47]

### C.   Whether Plaintiff's Fourteenth Amendment Claim Against the Deputy Commissioner Defendants (Bellnier and O'Gorman) Must Be Dismissed

The Court begins its analysis by observing that, to the extent that Plaintiff relies on the fact that the date of his Ad Seg admission hearing and the frequency of some his subsequent status reviews did not comply with the version of DOCCS Directive 4933 in effect at the time, such a failure *alone* (i.e., without an accompanying due process violation) is insufficient to create a genuine dispute of material fact.   *H'Shaka v. O'Gorman*, 444 F. Supp.3d 355, 373 (N.D.N.Y.

---

[47]       In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).   Alternatively, the Court can (and does) deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made–i.e., referencing some claims or defenses but not others–a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

2020) (Suddaby, C.J.) (collecting cases); *see, e.g., Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) ("[T]he violation of [a state regulation establishing a five-day deadline for a superintendent's hearing following an inmate's placement in segregated confinement] *alone* would not be enough generally to establish a constitutional claim.") (emphasis added); *cf. Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights. . . .   At most, any violation of state procedural requirements would create liability under state law . . . .").

Here, Plaintiff's evidence of an accompanying due process violation is the fact that his misbehavior reports were few in number, sporadic in nature, and *mostly* non-violent.   Based on that similarity, he likens the facts of his case to those in *H'Shaka* (where the undersigned denied the defendants' motion for summary judgment with regard to the plaintiff's due process claim). The Court respectfully disagrees.

Certainly, in *H'Shaka*, one of the main reasons the Court found the existence of a genuine dispute of material fact precluding the entry of summary judgment on plaintiff's due process claim was the fact that his misbehavior reports in Ad Seg contained only a few charges (specifically, four), they occurred sporadically (specifically in May 2015 and July 2016 over the course of a nine-year period in Ad Seg), and were all non-violent (specifically, for interference, disobeying direct orders, possessing contraband, and making an unauthorized phone call). *H'Shaka*, 444 F. Supp.3d at 361, 374-75. However, here, the misbehavior reports contained ten more charges than in *H'Shaka* (numbering fourteen in total).   *See, supra*, Undisputed Fact No. 9 and note 7 of this Decision and Order.   Granted, the misbehavior reports in this case arguably were issued with approximately the same degree of frequency (or infrequency) as the

misbehavior reports were in *H'Shaka*: being issued on four days in the first half of 2012 (specifically, on one day in each of the months of February through May of 2012) and on one day in January 2020 over the course of a fifteen-year period in this case, versus occurring on one day in May 2015 and on one day in July 2016 over a nine-year period in *H'Shaka*. (Dkt. No. 108, Attach. 13, at 15.) However, three of the fourteen offenses in this case were violent (specifically, for violent conduct, assault on another incarcerated individual, and use of a weapon). *See, supra,* Undisputed Fact No. 9 and note 7 of this Decision and Order. As a result, it is difficult for the Court to liken Plaintiff's disciplinary history in this case to the plaintiff's disciplinary history in *H'Shaka*.

 In any event, even if the Court were to do so, in *H'Shaka*, three other reasons supported the Court's findings of the existence of a genuine dispute of material fact with regard to the plaintiff's due process claim: (1) the fact that Central Review Committee had noted in July and August 2017 that the plaintiff was a strong candidate for transition if he could continue his good communication and behavior (and showed such good behavior for the two-year period before October 2017 yet he was not released from Ad Seg); (2) the fact that the defendants had unofficially contemplated the possibility of a less-restricted environment based on the plaintiff's improved behavior; and (3) the fact that the defendants had included more details in their reviews after the plaintiff had filed his complaint. *H'Shaka*, 444 F. Supp.3d at 361, 374-75. However, none of those reasons exist in this case.[48] As a result, this case presents a closer

---

[48] The closest that the circumstances of this case come to resembling either of the first two circumstances described above is the fact that Defendant Chappius made multiple recommendations to Defendant O'Gorman that Plaintiff be released from Ad Seg. (Dkt. No. 108, Attach. 17, at ¶¶ 29-31 [Chappius Decl.].) However, even setting aside the fact that these informal recommendations were made to someone who might not even have been a Deputy Commissioner at the time, the Court finds them to be distinguishable from the facts in *H'Shaka*, because they were admittedly made *orally* by only *one* individual based *solely* on a limited

question than in *H'Shaka*.

Unfortunately, this close question is not answered by a careful comparison of the

undisputed facts that exist regarding what information Bellnier and O'Gorman considered during

their Ad Seg reviews of Plaintiff in this case versus the undisputed facts that existed regarding

what information Bellnier and O'Gorman considered in *H'Shaka*: those undisputed facts are

generally the same, although the facts appear slightly more numerous and detailed in this case

than they did in *H'Shaka*.   *Compare*, *supra*, Part I.C. of this Decision and Order, Undisputed

Fact Nos. 51, 52, 54-60 (describing Bellnier's and O'Gorman's review of Plaintiff's Ad Seg

status) *with H'Shaka*, 444 F. Supp.3d 366, Undisputed Fact Nos. 101-107 (describing Bellnier's

and O'Gorman's reviews of the plaintiff's Ad Seg status).

Rather, what tilts the scales in favor of reaching a different result in this case than in

*H'Shaka* , in the undersigned's view, is the fact that in this case Plaintiff's (more-numerous)

misbehavior reports were accompanied by (1) repeated refusals to participate in programing

(especially much-needed behavioral-treatment programming),[49] (2) perceived demonstrations of

---

number of brief personal interactions with Plaintiff during rounds, and not made in writing by a
facility-level review committee based on the more-copious information (including but not
limited personal observations of Plaintiff by correctional officers on a daily basis).   (*Id*., at ¶ 32;
Dkt. No. 108, Attach. 9, at 137-39, 142-43, 153, 180 [attaching pages "136," "137," "138,"
"141," "142 " "152," and "179" of Chappius Depo. Tr.].)   Because of these differences, they are
not enough to create the sort of conspicuous conflict in the record that existed in *H'Shaka*
between the Ad Seg recommendations and the Ad Seg determinations.

[49]      (*See, e.g.,* Dkt. No. 108, Attach. 21, at 67 [Ex. B to Eversley Decl., attaching
Administrative Review dated August 11, 2011, at Bates No. 364, stating, "Upon arrival at
Wende Correctional Facility, inmate Hendrix Refused Group Therapy Program. He let every
staff member know his displeasure. Inmate Hendrix is a prison-wise inmate who is adept at staff
and inmate manipulation. This can be seen in the facility as well as being reflected in this instant
offense [refusing group therapy]"]; Dkt. No. 108, Attach. 21, at 73 [Ex. B to Eversley Decl.,
attaching Administrative Review dated February 23, 2012, at Bates No. 346, stating that
Plaintiff's "attendance [in Group Therapy Program this period] is sporadic"]; Dkt. No. 108,
Attach. 23, at 71 [Ex. B to Eversley Decl., attaching Administrative Review dated December 3,

a lack of remorse,[50] and (3) documented concerns by staff that Plaintiff was demonstrating a

continuing pattern of manipulative behavior.[51]

---

2014, at Bates No. 215, stating, "Hendrix states that 'your step-down program is irrelevant and pointless to me.' He goes on to state, 'I refuse to be subjected to your programs, which are inapplicable and meaningless'"]; Dkt. No. 108, Attach. 25, at 34-35 [Ex. B to Eversley Decl., attaching Administrative Review dated August 16, 2019, at Bates Nos. 116 and 117, stating that Plaintiff "is refusing to take SOCTP" and that his "reported refusal to participate in SOCTP is exactly the type of behavior that indicates his attempts at reform are insincere"].)

[50]   (*See, e.g.,* Dkt. No. 108, Attach. 24, at 5 [Ex. B to Eversley Decl., attaching Administrative Review dated July 26, 2018, at Bates No. 174-76, stating that Plaintiff's "attitude and behavior suggest that he would lash out at anyone who declines to give him anything to which he felt entitled," and that "he shows no remorse for his crimes and no positive changes in his attitude since being placed in administrative segregation"]; *cf.* Dkt. No. 108, Attach. 25, at 35 [Ex. B to Eversley Decl., attaching Administrative Review dated August 16, 2019, at Bates No. 114-20, stating that Plaintiff's "lack of sincerity or remorse for his actions . . . weighed heavily in favor of continued confinement and supervision"].)

[51]   (*See, e.g.,* Dkt. No. 108, Attach. 21, at 73 [Ex. B to Eversley Decl., attaching Administrative Review dated February 23, 2012, at Bates No. 346, stating, "Even though inmate Hendrix only has one other inmate in Group Therapy Program, he has ***attempted to recruit him*** into his own special program"] [emphasis added]; Dkt. No. 108, Attach. 21, at 88 [Ex. B to Eversley Decl., attaching Administrative Review dated February 23, 2012, at Bates No. 346, stating, "At one point [during this period], he became frustrated with other [Group Therapy Program] inmates and ***combined with another inmate*** to drive out a third inmate. These actions reaffirm the fact that Hendrix is a dangerous and ***manipulative*** individual . . . he should not be trusted to house in general population."] [emphasis added]; Dkt. No. 108, Attach. 26, at 26 [Ex. B to Eversley Decl., attaching Administrative Review dated May 26, 2020, at Bates No. 42, stating, "Inmate Hendrix presents as being compliant with security and civilian staff. However, inmate is identified as being ***manipulative*** and having ***influence on the inmate RMHU population*** by Security and OMH staff. Security believes that he was responsible for ***inciting RMHU inmates*** to call for OMH Crisis and others being placed on a 1 on 1 suicide watch. The incident date was 3/20/20"] [emphasis added]; Dkt. No. 108, Attach. 27, at 13 [Ex. B to Eversley Decl., attaching Administrative Review dated November 6, 2020, at Bates No. 14, stating oftline"Inmate Hendrix's ***manipulative behavior continued*** during this review period. The facility reported to this Committee that after Inmate Hendrix raised an issue regarding visitation ***every inmate on the gallery*** wrote a letter raising the same issue even though the issue was not relevant to every inmate who wrote a letter. The facility advised further that after Inmate Hendrix raised an issue regarding [illegible] at the commissary every inmate onwon the gallery wrote a letter raising the same issue even though the issue was not relevant to every inmate who wrote a letter. It is clear that this is a pattern of behavior. It is clear that this pattern of behavior is continuing. The Committee is very concerned with this pattern of behavior"] [emphasis added].)

Plaintiff attempts to downplay this latter fact.    However, it cannot be ignored that his post-conviction conduct giving rise to this documented concern – like the events giving rise to both his underlying conviction for kidnaping, rape and murder and his subsequent conviction for attempted escape – almost always involved actions taken by Plaintiff together with one or more individuals (reenforcing the concern of manipulation).    *See, supra,* Undisputed Fact Nos. 1-4 & notes 5 and 49 of this Decision and Order.

Furthermore, regardless of whether this documented concern was justified, the concern played an express role in the determinations rendered by Defendants Bellnier and O'Gorman. (*See, e.g.,* Dkt. No. 108, Attach. 21, at 73 [Ex. B to Eversley Decl., attaching Administrative Review dated October 11, 2011, relied on by Defendant Bellnier, referencing attempted recruitment of another inmate]; Dkt. No. 108, Attach. 21, at 88 [Ex. B to Eversley Decl., attaching Administrative Review dated February 23, 2012, relied on by Defendant Bellnier, referencing manipulative behavior]; Dkt. No. 108, Attach. 15, at ¶ 26 [Bellnier Decl., stating, "When making my determinations for inmate Hendrix's periodic reviews, I had to consider all factors of his behavior. That included both negative (e.g., his initial crime of incarceration, his escape attempt, any misconduct that continued while in ad seg, and the committees' concerns about his manipulative behavior) and positive aspects (e.g., his periods of good behavior, his positive interactions with staff, and earned incentives)."]; Dkt. No. 108, Attach. 7, at 121 [attaching page "120" of O'Gorman Depo. Tr., stating, "Like I said earlier, it's easy for certain inmates to manipulate staff, to run under the radar in different facilities and still be up to nefarious activities. So you take a lot of this into determination."]; Dkt. No. 108, Attach. 7, at 64, 79, 80, 110, 133, 163, 164, 218 [attaching pages "63," "78," "79," "109," "132," "162," "163,"

and "217" of O'Gorman Depo. Tr., discussing "manipulat[ive]" behavior eleven other times]; *cf.*
Dkt. No. 108, Attach. 16, at ¶¶ 14, 22 [O'Gorman Decl., referencing inmate's "interactions" with
staff and other inmates].)

This was not the case in *H'Shaka*, which did not involve a documented concern by staff
about the plaintiff's manipulation of other inmates (not to mention a refusal to participate in
much-needed programming or a disciplinary history containing three convictions for violent
misconduct). *See, e.g., H'Shaka*, 444 F. Supp.3d at 360-67 (setting forth statement of
undisputed material facts); *see also generally H'Shaka v. O'Gorman*, 17-CV-0107, Exhibit H to
Declaration of James O'Gorman (N.D.N.Y. filed May 28, 2019) (containing H'Shaka's Ad Seg
review documents).   To the contrary, in *H'Shaka*, the genuine dispute of material fact arose
because of the "troubl[ing]" conflict that existed between, on the one hand, the defendants' open
acknowledgment of the plaintiff's improving behavior[52] and, on the other hand, their apparent
refusal to act in accordance with the Central Review Committee's observation that the plaintiff
was a strong candidate for transition if he could continue his good behavior (and their own
unofficial contemplation that the plaintiff might be moved to a less-restricted environment based
on his improved behavior). *H'Shaka*, 444 F. Supp.3d at 374 (citing record evidence in support of
analysis regarding first *Proctor* factor).

Again, this is not the case here, which involves no such observation by the Central

---

[52]    *See, e.g., H'Shaka v. O'Gorman*, 17-CV-0107, Declaration of James O'Gorman, at ¶ 41
(N.D.N.Y. filed May 28, 2019) ("In recent years, inmate H'Shaka's behavior has normalized, his
actions of misconduct have become less frequent, and far less serious than those acts which led
to his placement in Ad Seg.");   *H'Shaka v. O'Gorman*, 17-CV-0107, Declaration of Joseph
Bellnier, at ¶ 38 (N.D.N.Y. filed May 28, 2019) ("Since his placement in ad seg, and while I was
Deputy Commissioner, inmate H'Shaka's behavior had begun to normalize. The misconduct that
at one time was nearly constant had become less frequent, and far less serious than those acts
which led to his placement in ad seg.").

Review Committee or Defendants.   *See, e.g., supra,* Undisputed Fact No. 52 ("Both the facility-level review committee and the COASRC have consistently recommended that Plaintiff remain in Ad Seg.").   To the contrary, based on the citations provided above, even a cursory review of the record in this case reveals a rather steady stream of disciplinary convictions, refusals to participate in programming, perceived demonstrations of lack of remorse, and/or perceived attempts at manipulative behavior: occurring, for example, in 2011 (August and October), 2012 (February, March, April, and May), 2014 (December), 2018 (July), 2019 (August), and 2020 (January, March, and November).

For similar reasons, the Court must reject Plaintiff's argument that his case is analogous to *Proctor v. LeClaire*, 846 F.3d 597, 603 (2d Cir. 2017) ("[I]n the main, Proctor's behavior has remained positive. He has gone long stretches—including one period of almost four years—without any disciplinary reports. . . .   Particularly in the last eight years, DOCCS has observed that Proctor has made an extensive effort to minimize his disciplinary violations. . . . He received just one disciplinary report between December 2011 and the close of the record in this case. DOCCS considered Proctor's attitude positive, co-operative, and much improved.") (internal quotation marks and citations omitted).

Finally, Plaintiff must remember that, in and of itself, the repetition of certain language (about his being manipulative and/or an escape risk) in his Ad Seg reports does not render Defendants Bellnier's and O'Gorman's reviews of those reports a sham.   *See Colon v. Annucci*, 19-CV-0034, 2021 WL 3774115, at *7 (S.D.N.Y. Aug. 24, 2021) ("Simply using the same language in successive reports does not necessarily mean that the reviews were a sham.") (internal quotation marks omitted; collecting cases); *Vail v. Bellnier*, 19-CV-0034, 2020 WL

6530752, at \*9 (N.D.N.Y. June 15, 2020) ("Indeed, the fact that a prisoner is an escape risk is a

relevant factor to be considered throughout Ad. Seg. placement."), *adopted*, 2020 WL 5742699

(N.D.N.Y. Sept. 25, 2020); *Giano v. Kelly*, 89-CV-0727, 2000 WL 876855 \*17 (W.D.N.Y. May

16, 2000) ("[T]he original reasons for placing the inmate in [administrative segregation] may be

compelling."), *accord*, *Giano v. Selsky*, 91-CV-00166, 2002 WL 31002803, at \*7 (N.D.N.Y.

Sept. 5, 2002); *cf. Edmonson v. Coughlin*, 21 F. Supp. 2d 242, 253 (W.D.N.Y. 1998) ("The fact

that the ASRC [memoranda] repeated the same rationale each week . . . is not a basis for finding

that the ASRC violated due process.").

Under the circumstances, the Court finds that denying Defendants' motion with regard to

Plaintiff's procedural due process claim would violate the Second Circuit's proscription against

"substitut[ing]" the Court's judgment for that of Defendants or "rebalanc[ing]" the criteria

required by the DOCCS regulations.   *See Proctor*, 846 F.3d at 608 ("We may not substitute our

judgment for Defendants', nor may we rebalance the section 301.4(d) criteria.").

### D.    Whether Plaintiff's Two Eighth Amendment Claims Against the Superintendent Defendants (Chappius, Reardon, Colvin, or Thomas) Must Be Dismissed

Beginning with Plaintiff's claim for grossly disproportionate sentences to solitary

confinement that serve no legitimate penological purpose under the Eighth Amendment, after

carefully considering this claim, the Court finds that it must be dismissed for the second of the

two reasons stated by Defendants in their memoranda of law: Plaintiff has failed to adduce

admissible record evidence establishing the second prong of the standard governing this claim

(requiring that Defendants imposed the conditions with deliberate indifference), because these

four Superintendent Defendants lacked the authority to release Plaintiff from confinement in Ad

Seg. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court

notes that Plaintiff does not oppose the dismissal of his related claim against these four

Superintendent Defendants (arising from their alleged denial of due process under the Fourteenth

Amendment) based on their lack of personal involvement in the Ad Seg review process. *See,*

*supra,* I.B.2. of this Decision and Order.

Turning to Plaintiff's claim for inadequate conditions of confinement under the Eighth

Amendment, after carefully considering this claim, the Court finds that it must be dismissed for

each of the two alternative reasons stated by Defendants in their memoranda of law: (1) except

with regard to his claim challenging the conditions of his Ad Seg confinement at Elmira C.F.,[53]

Plaintiff has failed to adduce admissible record evidence establishing the first prong of the

standard governing this claim (requiring that the conditions of Plaintiff's confinement posed an

unreasonable risk of serious damage to his health) because the conditions of Plaintiff's Ad Seg

confinement (which were consistent with the general conditions in SHU) have repeatedly been

found constitutional as a matter of law;[54] and (2) in any event, with regard to all of the facilities

---

[53]     The Court finds that the evidence of a rodent and insect infestation in the Ad Seg at
Elmira C.F., when combined with all of the other asserted conditions in the Ad Seg at Elmira
C.F. (including the constant occurrence of shouting and the "count" light often being left on
there), gives rise to a genuine dispute of material fact regarding the objective prong of an Eighth
Amendment claim. (Dkt. No. 108, Attach. 4, at 49-52, 148-51 [attaching pages "48" through
"51" and "147" through "150," of Plf.'s Depo. Tr.].)   In short, admissible record evidence exists
from which a rational jury could conclude that conditions were materially worse there than in the
Ad Segs of the other two correctional facilities in question.

[54]     *See, e.g., Tavares v. Amato,* 954 F. Supp.2d 79, 92 (N.D.N.Y. 2013) (McAvoy, J.)
("Generally, administrative segregation conditions, even though restrictive and harsh, are
insufficient to establish Eighth Amendment violations because they are part of the penalty that
criminal offenders pay for their offenses against society.") (internal quotation marks omitted); *cf.*
*Colon v. Annucci,* 17-CV-0445 2021 WL 3774115, at *6 (S.D.N.Y. Aug. 24, 2021) ("The record
provides no evidence to suggest that Plaintiff was subjected to anything but ordinary SHU
conditions while he was placed in Ad Seg—and simply experiencing standard SHU conditions in
the intermediate tier of analysis does not, by itself, establish a protected liberty interest.");

at which he was confined, Plaintiff has failed to adduce admissible record evidence establishing

the second prong of the standard governing this claim (requiring that Defendants imposed the

conditions with deliberate indifference), because there is no evidence in the record that the

Superintendent Defendants even knew of (much less disregarded) Plaintiff's complained-of

conditions of confinement. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order.

With regard to the first reason, the Court adds that, although Plaintiff has adduced

admissible evidence that, while he was in Ad Seg at all three correctional facilities, *sometimes* a

chaplain making rounds would not stop and knock (in the event Plaintiff did not see the chaplain

coming), and/or that *sometimes* programs and services would not be available (because of

staffing issues resulting from incidents), the Court finds that he has not shown those events

constituted such a departure from the ordinary conditions of confinement in Ad Seg as to elevate

the conditions of confinement to a constitutional dimension.   (Dkt. No. 108, Attach. 4, at 35-36,

68-69, 107-08 [attaching pages "34," "35," "67," "68," "106," and "107" of Plf.'s Depo. Tr.].)

*Cf. Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug. 27, 1996)

("[B]ecause Nogueras has not shown that any particular conditions of his confinement were

substantially dissimilar to those faced by inmates placed in administrative segregation or

protective custody, the Court finds that his confinement did not impose any atypical hardships.").

The Court reaches a similar conclusion with regard the occurrence of shouting and the fact that

the "count" light was sometimes left on at facilities other than Elmira C.F.   (Dkt. No. 108,

Attach. 4, at 49-52, 148-51 [attaching pages "48" through "51," and "147" through "150," of

---

*Nogueras v. Coughlin*, 94-CV-4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug. 27, 1996)
("Restrictions on telephone use, recreational activities, access to law libraries, visitation,
personal property, educational and employment opportunities generally apply to all inmates
confined to SHU regardless of the reason that they have been placed there.") (citing cases).

Plf.'s Depo. Tr.].)   *See Sealey v. Giltner*, 197 F.3d 578, 581-82, 589 (2d Cir. 1999) (affirming district court decision that concluded that constant and excessive noise in SHU were the sort of confinement that the plaintiff should reasonably anticipate receiving at some point in his incarceration).

With regard to the second reason, the Court adds that the closest question presented on this issue arises with regard to Plaintiff's conditions-of-confinement claim against Defendant Chappius (who was the superintendent of Elmira C.F.). Granted, admissible record evidence exists from which a rational fact-finder could conclude that the conditions of Plaintiff's confinement in Ad Seg at Elmira C.F. were worse that the conditions elsewhere, involving an exposure to infestations of rodents and insects, as well as other unsanitary conditions.   (Dkt. No. 108, Attach. 4, at 49, 111 [attaching pages "48" and "110" of Plf.'s Depo. Tr.].)   The problem is that, although Plaintiff spoke at least five times to Defendant Chappius about "updates regarding my placement" in Ad Seg, he does not recall ever speaking to Chappius about the *conditions* of his confinement in Ad Seg.   (Dkt. No. 108, Attach. 4, at 99 [attaching page "98" of Plf.'s Depo. Tr., testifying that he asked Chappius "about updates regarding my placement at ad seg," but "I can't recall" asking about anything else].)   Certainly, Defendant Chappius recalls no such conversation about the conditions of Plaintiff's confinement.   (*See generally* Dkt. No. 108, Attach. 17, at ¶ 29 [Chappius Decl.]; Dkt. No. 108, Attach. 9, at 58-59, 105 [attaching pages "58," "58," and "104" of Chappius Depo. Tr.].)[55]   Under the circumstances, it would be pure

_____

[55]     The Court notes that, although Plaintiff filed a grievance about the unsanitary conditions in Ad Seg at Elmira C.F. (without mentioning a rodent or insect infestation), that grievance was granted.   (Dkt. No. 108, Attach. 4, at 111 [attaching page "110" of Plf.'s Depo. Tr.].) Moreover, Plaintiff has pointed to no admissible record evidence establishing that Defendant Chappius knew of any continued complaint by Plaintiff about the unsanitary conditions in Ad Seg at Elmira C.F. (despite Plaintiff's grievance having been granted).

speculation to find that Defendant Chappius exhibited deliberate indifference by failing to remedy the asserted conditions at Elmira C.F.

**E.      Whether Plaintiff's Two Eighth Amendment Claims Against the Deputy Commissioner Defendants (Bellnier and O'Gorman) Must Be Dismissed**

After carefully considering this issue, the Court answers this question in the affirmative for each of the two alternative reasons stated by Defendants in their memoranda of law: (1) except with regard to his claim challenging the conditions of his Ad Seg confinement at Elmira C.F., Plaintiff has failed to adduce admissible record evidence establishing the first prong of the standard governing these claims (requiring that the conditions of confinement result in unquestioned and serious deprivations of basic human needs such that the conditions pose an unreasonable risk of serious damage to one's health), because the conditions of Plaintiff's Ad Seg confinement (which were consistent with the general conditions in SHU) have repeatedly been found constitutional as a matter of law; and (2) in any event, with regard to all of the facilities at which he was confined, Plaintiff has failed to adduce admissible record evidence establishing the second prong of the standard governing this claim (requiring that the defendants imposed the conditions with deliberate indifference, meaning that the defendants knew of, and disregarded, an excessive risk to the plaintiff's health or safety), because there is no evidence in the record before the Court that Defendants Bellnier and O'Gorman even knew of (much less disregarded) Plaintiff's complained-of conditions of confinement. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To these reasons, the Court adds only four points.

First, it is undisputed that during the time in question – *typically* – individuals in Ad Seg were allowed outdoors for one hour of recreation per day in an individual recreation cell, could converse with other inmates through their cell doors or during recreation, could interact with

officers during rounds occurring every 30 minutes, had access to a religious chaplain, and were subject to daily rounds performed by a medical nurse, and OMH nurse, and an OMH counsel. *See, supra,* Undisputed Fact Nos. 11-14, 19.

Second, as stated above in Part III.D. of this Decision and Order, although Plaintiff has adduced admissible evidence that, while he was in Ad Seg at facilities other than Elmira C.F., sometimes a chaplain making rounds would not stop and knock (in the event Plaintiff did not see the chaplain coming), sometimes programs and services would not be available (because of staffing issues resulting from incidents), sometimes there would be shouting, and/or sometimes the "count" light would be left on, he has not shown those conditions to constitute such a departure from the *ordinary* conditions of confinement in Ad Seg as to elevate the conditions of confinement to a constitutional dimension.

Third, it is undisputed that Plaintiff's diagnosis of bipolar disorder predated his confinement.   (Dkt. No. 108, Attach. 4, at 29, 125 [attaching pages "28" and "124" of Plf.'s Depo. Tr.].)   It is also undisputed that, during the relevant period, Plaintiff had access to mental health services.   *See, supra,* Undisputed Fact No. 15.

Fourth, and finally, it is undisputed that, in making his determinations to retain Plaintiff in Ad Seg, Defendants Bellnier considered (1) the recommendations of each review committee (including any attached correspondence from Plaintiff), (2) all aspects of Plaintiff's behavior (including his current and recent behavior), and (3) whether Plaintiff's history of violence and propensity for escape had dissipated after his periods of good conduct while in Ad Seg; and Bellnier based his determination on the maintenance of a safe and secure prison environment for visitors, staff, and other incarcerated individuals.   *See, supra,* Undisputed Fact Nos. 55-56,

59-60.   It is also undisputed that, in doing so, Defendant O'Gorman similarly considered (1) the recommendations of each review committee, (2) all aspects of Plaintiff's behavior (including his past, current, and future behavior), and (3) whether Plaintiff's history of violence and propensity for escape had dissipated after his periods of good conduct while in Ad Seg; and O'Gorman based his determination on the maintenance of a safe and secure prison environment for visitors, staff, and other incarcerated individuals.   *See, supra,* Undisputed Fact Nos. 58-60.   Although these facts are not dispositive of whether Defendants Bellnier and O'Gorman possessed a sufficiently culpable state of mind in continuing Plaintiff's Ad Seg confinement for purposes of an Eighth Amendment claim, they are certainly probative of that issue.

Simply stated, even if the Court were to stretch the bounds of reason and find that a genuine dispute of material fact exists with regard to the objective element of each of these two Eighth Amendment claims against Defendants Bellnier and O'Gorman with regard to the Ad Seg conditions at all three correctional facilities (and not just Elmira C.F.), the Court would be unable to do so with regard to the subjective element of either of those two claims: there is no admissible record evidence that Defendants Bellnier and O'Gorman acted with deliberate indifference.

### F.      Whether, in the Alternative, Plaintiffs' Claims Against Defendants Must Be Dismissed Based on the Doctrine of Qualified Immunity

Because adequate grounds exist on which to base a decision of Defendants' motion, the Court need not, and does not, reach their arguments regarding qualified immunity.

### G.      Whether Plaintiff's Claims Against the 15 Doe Defendants Must Be Dismissed

After carefully considering this issue, the Court answers this question in the affirmative

49

for each of two alternative reasons.   First, Plaintiffs have failed to name and serve the 15 Doe

Defendants despite an ample opportunity to conduct discovery (including the opportunity to

depose Kevin McCarthy), and the deadline for motions to amend has long-since expired.   (See,

e.g., Dkt. Nos. 63, 72, 77, 91, 126.)   As a result, dismissal is warranted under Fed. R. Civ. P.

41(a)(2).

Second, even if the Court were to assume that the above-referenced Doe Defendants were

members of the Special Housing Management Committees ("SHMCs") of Elmira C.F., Marcy

C.F. and Five Points C.F. during the relevant time periods (*see* Dkt. No. 42, at ¶ 24), the Court

would be unable to find any admissible record evidence from which a rational fact-finder could

conclude that any of these Defendants committed either a Fourteenth Amendment or an Eighth

Amendment violation for the same reasons as stated above.   *See, supra,* Parts III.C., III.D. and

III.E. of this Decision and Order.

### H.   Whether the Court Should Nonetheless Deny Defendants' Motion Because of Defendants' Failure to Disclose, Earlier in this Action, the Identity and Role of Kevin McCarthy

After carefully considering this issue, the Court answers this question in the negative for

each of two reasons.

First, the Court construes Plaintiff's opposition memorandum of law as containing the

threshold argument that the Court should deny Defendants' motion based on the timing and

extent of their disclosure of Kevin McCarthy as a witness, because (a) Defendants' motion

depends on McCarthy's testimony, and (b) that testimony is inadmissible (given the prejudicial

effect of Defendants' failure, earlier in this action, to disclose McCarthy as a witness).   *See,*

*supra,* Part I.B.2. of this Decision and Order.   The Court has some trouble accepting Plaintiff's

argument that the entirety of Defendants' motion *depends* on McCarthy's testimony.   Although some portions of the motion certainly benefit from that testimony (such as the establishment of the *typical* conditions of confinement experienced by incarcerated individuals housed in SHU in DOCCS facilities during the time in question), that benefit appears redundant of other evidence in the record (such as DOCCS Directive 4933).   *See, e.g., supra,* note 8 of this Decision and Order.

In any event, the Court must reject Plaintiff's claim of uncured prejudice.   Although the Court finds that defense counsel should have disclosed McCarthy earlier as an individual likely to have discoverable information that Defendants may use in support of their defenses, the Court finds that any prejudice to Plaintiffs has been sufficiently mitigated by the fact that (a) his identity was contained within the 637 pages of Ad Seg documents produced to Plaintiff, (b) several deponents mentioned the role of COASRC and its individual members in the Ad Seg review process (but Plaintiff's counsel failed to delve deeper into this topic during discovery), and (c) Plaintiff has been given, and has availed himself of, an opportunity to both depose McCarthy and supplement his opposition to Defendants' motion.

Second, in any event, the Court construes Plaintiff's memorandum of law as containing an alternative argument that, at a minimum, the Court should defer ruling on Defendants' motion in order to allow Plaintiff to (i) take discovery regarding Kevin McCarthy's involvement in Plaintiff's Ad Seg reviews, and (ii) seek leave to file an Amended Complaint naming McCarthy as a Defendant.   *See, supra,* Part I.B.2. of this Decision and Order.   The Court has granted the relief requested by that alternative argument.   As stated in the prior paragraph, Plaintiff was given an opportunity to depose McCarthy.   (Dkt. No. 126.)   Plaintiff's motion to amend was

denied without prejudice.   (*Id*.)   Rather than renew that motion, Plaintiff agreed to forgo that

renewal unless he won Defendants' motion.   (Dkt. No. 131, at 2, ¶ 3 [Stipulation].)   He has lost

that motion – despite having had the benefit of deposing McCarthy, and supplementing his

opposition to Defendants' motion.   (Dkt. No. 132 [totaling 138 pages].)   Under the

circumstances, the only further relief that might be conceivably warranted would be an

opportunity for Plaintiff to move to amend his Amended Complaint to assert a claim against

McCarthy.

**I.      Whether the Court, Despite Its Granting of Defendants' Motion in Its
          Entirety, Should *Sua Sponte* Grant Plaintiff Thirty (30) Days in Which to
          File a Motion for Leave to File a Second Amended Complaint Naming Kevin
          McCarthy as a Defendant**

As indicated above in Part III.H. of this Decision and Order, by Stipulation, the parties

agreed that the Court's act of granting Defendant's motion in its entirety would not foreclose the

ability of Plaintiff being able to file a motion for leave to amend his Amended Complaint.   (Dkt.

No. 131, at 2, ¶ 3 ["Following the Court's decision on the Motion for Summary Judgment, *and

only if Defendants' Motion for Summary Judgment is not granted in its entirety*, Plaintiff, within

thirty (30) days of the Court's decision, may file a renewed motion for leave to amend the

complaint to add Kevin McCarthy as a defendant . . . ."] [emphasis added].)   This makes sense,

given that, in the Court's view, the dismissal of the operative pleading in an action deprives the

Court of jurisdiction over an action in which a plaintiff could file an amended pleading.[56]   In

---

[56]      *See, e.g., Wilmer v. Albany Cnty. Police*, 19-CV-1416, 2020 WL 137240, at *1, n.3
(N.D.N.Y. Jan. 13, 2020) (Suddaby, C.J.) ("After all, federal district courts possess
subject-matter jurisdiction over actions, which is generally lost after the dismissal of the
operative complaints in those actions, except with regard to ancillary jurisdiction over certain
collateral matters (such as the award of attorney's fees and costs, the imposition of Rule 11
sanctions, and the enforcement of compliance with the terms of a settlement agreement that has
been made part of the order of dismissal).   The filing of a new operative pleading does not
appear to be a collateral matter: rather, it appears to be what does or does not confer federal

any event, the Court may, of course, stay its dismissal of Plaintiff's Amended Complaint pending receipt of, and a decision regarding, a motion to amend that pleading.   The question is whether the Court should do so under the circumstances.

After carefully considering the matter, the Court answers that question in the negative for each of two reasons.   First, as the Court has just indicated, Plaintiff has expressly agreed to give up his ability to file a motion to amend in the current circumstance.   (Dkt. No. 131, at 2, ¶ 3.) Defendants should be entitled to enjoy the benefit of their bargain.

Second, in any event, in his supplemental opposition, Plaintiff expressly concedes that Kevin McCarthy lacked personal involvement in the Eighth Amendment violations claimed. (*See, e.g.*, Dkt. No. 132, at 4 ["[T]he record now reflects that McCarthy has no personal knowledge of the conditions in which Hendrix was held because McCarthy was either never at that facility, or not at that facility at the same time as Hendrix."].)   Moreover, as one of three members of the COASRC that reviewed the written recommendation made by the facility-level committee and made a recommendation to the Deputy Commissioner for Correctional Facilities, McCarthy possessed personal involvement in the Fourteenth Amendment violation claimed that was no greater than the personal involvement of either Defendants Bellnier or O'Gorman, against whom that claim has been dismissed.   *See, e.g., supra,* Undisputed Facts Nos. 34, 36, 38, 39, 49.   In other words, for the same reason that Plaintiff's Fourteenth Amendment claim against Defendants Bellnier or O'Gorman should be dismissed, any Fourteenth Amendment claim against Kevin McCarthy would be futile: McCarthy's determinations were based on the same packets of information as were Bellnier's and O'Gorman's (constitutionally compliant) determinations.   *See, supra,* Part III.C. of this Decision and Order.

---

jurisdiction on the district court.").

For all of these reasons, the Court finds that Defendants' motion should be granted in its entirety, Plaintiff's Amended Complaint should be dismissed, and this action should be closed.

**ACCORDINGLY**, it is

**ORDERED** that the Clerk of Court is directed to substitute Daniel F. Martuscello III for Defendant Anthony J. Annucci pursuant to Fed. R. Civ. P. 25(d) because the former is the successor of the latter, who retired on June 9, 2023; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 108) is **<u>GRANTED</u>** in its entirety; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 42) is **<u>DISMISSED</u>**; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants and close this action.

Dated: March 26, 2024
           Syracuse, New York

Glenn T. Suddaby
U.S. District Judge